**Z. P. CHAGAS, Appellant,**
v.
**John J. BERRY, Appellee.**

**John J. BERRY, Appellant,**
v.
**Ervin W. ATKERSON, Appellee.**
No. 23346.

United States Court of Appeals
Fifth Circuit.
Dec. 12, 1966.

———◆———

Ernest May, Fort Worth, Tex., for appellant.

John W. Price, Charles C. Whitener, Dallas, Tex., for Berry. Curtis White, Dallas, Tex., Robert M. Greenberg, Johnson, Guthrie, White & Stanfield, Dallas, Tex., for Atkerson.

Before BROWN, COLEMAN and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge:

John J. Berry sued Mrs. Z. P. Chagas and Ervin W. Atkerson for damages for fraud allegedly perpetrated upon him in various transactions centered around his efforts to acquire the Crown Hill Memorial Cemetery in Dallas, Texas. There was a directed verdict in favor of Atkerson, which will be affirmed. There was a jury verdict and judgment against Mrs. Chagas, which must be reversed and remanded for a new trial.

The complaint charged actionable fraud under Vernon's Ann.Tex.Civ.Stat., Art. 4004.[1] It also charged common law fraud[2] and violation of the Texas Securities Act, Art. 581–33.[3]

1. (B) Tex.Rev.Civ.Stat.Ann. art. 4004 (1945):

Actionable fraud in this State with regard to transactions in real estate or in stock in corporations * * * shall consist of either a false representation of a past or existing material fact, or false promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract. Whenever a promise thus made has not been complied with by the party making it within a reasonable time, it shall be presumed that it was falsely and fraudulently made, and the burden shall be on the party making it to show that it was made in good faith but was prevented from complying therewith by the act of God, the public enemy or by some equitable reason. All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract. All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons willfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered.

2. It has been said that to constitute actionable fraud at common law in Texas it must appear,

* * * (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury. The gist of an action based upon fraud is found in the fraud of defendant and damage to plaintiff. Each of these elements must be established with a reasonable degree of certainty, and the absence of any one of them will prevent a recovery.

Wilson v. Jones, 45 S.W.2d 572, 573 (Tex. Com.App.1932).

3. The Texas Blue Sky Law, Vernon's Tex. Rev.Civ.Stat.Ann. art. 581–33:

Any person who * * *

(2) Offers or sells a security * * * by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made not misleading (when the person buying the security does not know of the untruth or omission, and who in the exercise of

In the course of their dealings, lasting over several months in late 1962 and early 1963, the parties, with the exception of Atkerson, managed to involve themselves in a highly tangled factual skein. Since the verdict was for Mr. Berry we shall attempt to summarize the facts in that light most favorable to his contentions.

Mrs. Chagas testified she acquired the cemetery in "the latter part" of 1961. Counsel for Mr. Berry believed that September 1 or 2, 1961, was the date of purchase. Mrs. Chagas paid eighty or eighty five thousand dollars for the property, sixty or sixty five thousand in cash and a promissory note for $20,000. About September 21, 1961, an appraisal was run on the cemetery for Mrs. Chagas. The cemetery was appraised at $790,000, quite an increase in less than thirty days. In April or May, 1962, a personal financial statement was drawn up on Mrs. Chagas, bearing her signature. That statement also listed the value of the cemetery at $790,000, terming it "Appraisal Value". The September, 1961, appraisal stated there were 5100 lots available in the cemetery.

In May of 1962 Mrs. Chagas sold Crown Hill Memorial Park to Walter W. Cloud, taking his promissory note for the full amount of the purchase price, $350,000. The note was secured by a pledge of all the capital stock of Crown Hill Memorial Park, Inc., the corporation which owned the cemetery. Simultaneously some form of typical Texas real estate mortgage security device was executed as additional security for the Cloud note; the corporation was trustor, Mrs. Chagas' attorney was trustee, and the cemetery land was the trust corpus.

On May 9, 1962, Mrs. Chagas conditionally assigned (pledged) the $350,000 Cloud note, together with the appendant pledged stock and deed of trust, to Ervin W. Atkerson. Her purpose was to secure payment of a note she owed Atkerson.

Mrs. Chagas began trying to sell the Cloud note. Through a chain of real estate brokers, she was brought in touch with Mr. Berry. She forwarded to him, through the brokers, several papers, including a copy of the Cloud note and a copy of the appraisal mentioned above. Apparently Mrs. Chagas' personal financial statement was among the papers forwarded. At some point about this time, a copy of a contract between Mr. Cloud and a California corporation, PCA Development Co., Inc., for the development of the cemetery, was shown to Mr. Berry.

The brokers involved were a Mrs. Gene Berger and a Mr. E. C. McReynolds. In originally making contact with Mr. Berry, Mrs. Chagas seems to have talked to Mr. McReynolds, who wrote a letter to Mrs. Berger, who notified Berry. Berry's many further contacts with Mrs. Chagas usually came through McReynolds or Mrs. Berger. Mr. Cloud, the owner of the cemetery at that time, was called by "A couple of real estate brokers who apparently were negotiating the transaction for Mrs. Chagas" and asked " * * * to cooperate with them." Cloud thought that request came in July, 1962.

Mr. Berry came to Dallas to discuss the trade in August, 1962. On August 16, Mrs. Chagas introduced Berry to Mr. Coppingen of PCA Development Co., who told Berry " * * * they were going to make a wonderful deal * * * " of the ceme-

reasonable care could not have known of the untruth or omission) is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent * * * per year from the date of payment, less the amount of any income received on the security upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six per cent * * * per year on such value from the date of disposition. Nothing herein shall prevent the award of punitive or exemplary damages in an amount not to exceed twice the actual damages, as found by the jury, when such false representation or omission is proven to be willfully made.

tery. Berry never saw Coppingen again. Mr. Cloud testified it had become evident around the first of July, 1962, that PCA was not going to perform.

On August 17, 1962, Mrs. Chagas agreed to sell to Mr.. Berry and one L. C. Martz the $350,000 Cloud note, already pledged to Atkerson. The contract stated that Berry and Martz would pay Mrs. Chagas $150,000 each on or before October 1, 1962; would execute a note for $75,000 due on or before six months after August 17, 1962; and would convey to Mrs. Chagas 6,400 or 6,520 acres of land in Colorado. The Colorado land was agreed by the parties to be worth $19.50 per acre. Mrs. Chagas gave Mr. Berry credit for $132,000 on the Colorado land.

Berry testified it was also part of the agreement that Mrs. Chagas would get them a loan of $200,000 or $250,000, to pay her the $150,000 and for operating funds. When she did not do so before the contract to buy the Cloud note was signed, Martz refused to sign. Martz was part owner of the Colorado land. When Berry executed a warranty deed to Mrs. Chagas on August 17, 1962, her lawyer said the deed conveyed only 3,200 acres of land. Berry thereafter acquired what title his partners had to the land, which of course passed to Mrs. Chagas under the August 17 deed.

The contract of August 17, 1962, provided that Mrs. Chagas would "immediately upon the execution hereof" deliver the $350,000 note to an escrow agent, pending completion of the sale. The note was never so delivered. It was Mr. Berry's impression that the deed was also to go into escrow, although the contract does not so provide. At any rate, the deed did not go into escrow. Mrs. Chagas had it recorded in Colorado on August 21, 1962, four days after it was signed.

Mrs. Chagas arranged a meeting between Berry and Ervin W. Atkerson in Dallas in September, 1962. Berry's request for a $200,000 loan was turned down. Mr. Atkerson told Berry the cemetery already owed him $124,000. Atkerson knew of the Colorado land, as well as the sale of the Cloud note to Berry. Nei-

ther Atkerson nor Mrs. Chagas ever told Berry the Cloud note was already pledged to Atkerson.

An extension was granted for Berry to pay his $150,000 note, but at the end of that extension, October 8, 1962, it had not been paid. Instead of understanding that according to the contract that portion of the trade was closed, Berry's testimony reveals that he thought he still owed Mrs. Chagas the $150,000, and that the trade was still on.

On December 1, 1962, Mrs. Chagas foreclosed on Walter W. Cloud for failure to live up to his note and contract to pay her $350,000. On Christmas day of that year, Mrs. Chagas met Berry in Sante Fe, New Mexico, and worked out a "new deal". Berry agreed to purchase all the stock of Crown Hill Memorial Park, Inc., to be paid in part by Berry's promissory note for $113,000, the note to be secured by a pledge of the stock. As earnest money, Berry paid Mrs. Chagas $5,000 in cash. He had already paid her $35,000 (a discount Mrs. Chagas allowed on Berry's note for $75,000). Berry was allowed credit for these amounts on the stock purchase. She also allowed him $132,000 on the Colorado land, which she testified she later sold for $80,000 (apparently she sold 6400 acres of land, not 3200).

On January 15, 1963, Berry paid Mrs. Chagas $50,000 more in Albuquerque, New Mexico, and executed his note to her for $113,000. Mrs. Chagas returned to Dallas and had the Crown Hill stock issued to Berry, although possession of the stock certificates remained in the hands of Mr. Atkerson, because Mrs. Chagas had sold Berry's $113,000 note, to which the stock was pledged, to Atkerson.

Berry came to Dallas and began to operate the cemetery. He only paid $100 on his $113,000 note.

In 1963, Berry complained to Mrs. Chagas there were some 700 fewer plotted grave spaces than she had claimed. He also discovered there was $62,000 more indebtedness against the cemetery than Mrs. Chagas had represented, due to an

obligation to perform certain services for owners of prepaid vaults.

Berry testified he refused to pay the $113,000 note on the advice of counsel.

Berry had known that the PCA company was not going to perform as early as September, 1962, but he went through with the stock purchase in January of 1963 "to save the rest of his investment".

At the time of trial, the cemetery was "owned" by one Wayne Johnson. He purchased its stock from Mrs. Chagas on May 6, 1965. On cross-examination he appeared to have had almost as much experience at trading as Mrs. Chagas.

From the foregoing it will be seen that Mr. Berry was separated from and Mrs. Chagas received possibly as much as $230,400 or its equivalent, computed as follows:

(1) $90,000 paid as itemized above.

(2) $132,000 represented by the Colorado land, if that was its fair market value at the time of the trade. Mrs. Chagas credited Berry with that amount, but sold the land for $52,000 less.

(3) $8,400 which Berry says he paid on vault obligations of the cemetery, chargeable to Mrs. Chagas. The evidence on this point seems to fall far short of being specific.

Moreover, Mrs. Chagas apparently retained Mr. Berry's $113,000 note but its fate or validity, so far as we can tell from the record, was not made manifest by the evidence offered at the trial.

When Mr. Berry became dissatisfied with his purchase, or when he discovered that he had been defrauded, whichever it was, he did not return the property along with a demand for rescission. There was not any suit in equity for an accounting.

In any event, this suit for damages in the sum of $230,400, plus punitive damages, was filed.

■ The motion for a directed verdict in favor of Atkerson was correctly granted. There was no evidence of fraudulent participation on his part. It is true that he did not tell Berry that the Cloud note had been pledged to him. He was not trying to sell the Cloud note. Berry and Mrs. Chagas were applying to him for a loan, which he declined to make. He did tell Mr. Berry that the cemetery owed him $124,000, which put Mr. Berry on notice as to the amount of the debt Atkerson held against the property.

If there was liability, which we shall discuss in a moment, the Judgment against Mrs. Chagas must be reversed and remanded for a new trial as to the damages awarded. As often happens, such issues as the parties got their hands on were heatedly contested, blurred, confused, or altogether lost. We make no effort to assess the blame for this, if blame there be; we simply state the circumstances. In all of the controversy that went on, in the midst of many motions and objections, the court overlooked charging the jury on the measure of damages. The Texas statutes set out in the margin, specifically prescribe the method of computation. The common law standards are, of course, plain. Being left without instructions or standards, the jury simply returned a verdict for the full amount sued for, plus $50,000 punitive damages.

■ This omission is not to be laid solely at the door of the Court. None of counsel objected, excepted, or otherwise brought this to the Court's attention. Remembering as we do that Counsel has the duty to except, Fed.R.Civ.P., Rule 46, 28 U.S.C.A., we must nevertheless, of our own motion, notice the total absence of any guidance in this crucial area as being plan error necessitating a new trial, United States v. 353 Cases of Mount. Val. Mineral Water, 8 Cir., 1957, 247 F.2d 473.

■ For reasons which we shall summarize briefly we have great difficulty in satisfying ourselves that there was sufficient evidence to go to the jury on the issues of fraud. But we entertain no doubt at all that even though the evidence is insufficient this is not a case for a reversal and rendition. On the contrary, this case, with all of its confusion, lack of adequate instructions, and deficiencies in proof, is one that calls for a

reversal and remand for a full development of the facts. This we frequently require. See Gulf Oil Corp. v. Wright, 5 Cir., 1965, 236 F.2d 46, 48; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84 (Text at footnote 55). [September 20, 1966]. As we have in those and similar cases we sound this caveat: "This does not necessarily forecast a full-blown trial. It may be that development of further facts by discovery process, affidavits, etc. will demonstrate that there is no real possibility of the Lessors ever making this proof." Weymouth v. Colorado Interstate Gas Co., supra.

■ In like view we stated: "We do not intend to predict now what the outcome of the retrial should, or may, be. All we hold is that this evidence raises this issue. It is futile to anticipate what the evidence may be on the retrial. It is almost certain to be different, and its sufficiency inevitably is a matter for initial determination by the trial Judge applying the principles here laid down but without any artifical effort to match that evidence, bit by bit, against that contained in the present record. See Smoot v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1962, 299 F.2d 525, 534." Duke v. Sun Oil Company, 5 Cir., 320 F.2d 853, at 866.

Following this approach we think these comments illustrate the problem on remand:

The Court did not charge the jury as to the standards of liability imposed by the statutes. He did charge as to "actual fraud". If, however, the jury acted only upon actual fraud, and if it ignored the Texas statutes, as we must assume it did since they were not included in the charge, we are confronted with several problems. For one, Mr. Berry actually got the stock he purchased, he took possession of the cemetery, and he operated it for over a year. He was not sold nonexistent property. So, if there was fraud it had to be inferred from the fact that Mrs. Chagas, in a rapidly developing major metropolitan area, bought for a low price and may have sold for a very high price. Obviously, this alone is not enough. Indeed, before she sold the cemetery to Berry she had sold it to Cloud for $350,000, although she got a note instead of cash. The proof was not directed toward the bull's-eye as to the true market value of Crown Hill Memorial Cemetery, the sole asset of the corporation. The case is further hyphenated by two separate phases, the first for the purchase of Cloud's note, which could have been worth $350,000 regardless of the value of the cemetery or the stock, the second for the purchase of the corporate stock itself. Moreover, if fraud was practiced as to the value of Cloud's note, the answer would seem to be that Mr. Berry did not comply with his contract of purchase and may have no room to complain of that transaction. Of course, everything with reference to it, if indicating fraud, would be competent evidence as to the totality of circumstances under which Mrs. Chagas later sold Berry the corporate stock. Similarly, as to misrepresentation of value by Mrs. Chagas the record is thin indeed. Perhaps it shows that the financial statements submitted or the plot of the potential lots was in error either as to value or as to the accounting treatment of certain deferred items. But these inaccuracies have to be brought home to her by circumstances showing requisite knowledge, actual or implied, and the purpose to defraud.

In this state of the record, we think the ends of justice require a new trial in order that the basis for a jury finding of liability may be made certain instead of left open to speculation and conjecture. Upon a new trial, with Atkerson omitted as a party defendant, it may be that the parties will wish to recast their pleadings so as to make the issues more precise. Certainly the trial court will, if the proof warrants, thoroughly charge the jury not only as to fraud but also as to the possible application of the Texas statutes. Competent proof must be presented as to what Mr. Berry really paid in money and property as well as to the fair market value of what he received.

■ Berry has moved this Court to dismiss Mrs. Chagas' appeal as frivolous

and that motion has been carried with the case. Obviously, it must be and it is hereby denied.

The Judgment of the District Court granting Atkerson's motion for a directed verdict is affirmed.

The Judgment awarding damages to the plaintiff-appellee Berry is reversed and remanded for a new trial on all issues.