**JAMISON COMPANY, INC.,**
**Plaintiff-Appellee,**

v.

**WESTVACO CORPORATION, formerly West Virginia Pulp and Paper Company, Defendant-Appellant.**

No. 74–3433.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1976.

Rehearing and Rehearing En Banc
Denied April 15, 1976.

See 530 F.2d 34.

Dean Booth, Michael C. Murphy, Atlanta, Ga., for defendant-appellant.

Gary N. Ackerman, Edward E. Dorsey, James H. Keaten, David M. Rapp, Atlanta, Ga., for plaintiff-appellee.

Before GOLDBERG and AINSWORTH, Circuit Judges, and NICHOLS, Associate Judge.[*]

GOLDBERG, Circuit Judge:

The facts and issues in this litigation revolve around the construction of defendant Westvaco's pulp plant at Wickliffe, Kentucky. In the spring of 1969, the plaintiff, Jamison Company, and the defendant entered into two contracts, each covering a different construction phase, under which Jamison agreed to supply and install piping at Westvaco's new mill. The first contract, set to begin on May 1, 1969, required completion by December 1, 1969, while the second contract contemplated that work would commence on May 5, 1969 and be finished by March 3, 1970. Westvaco obligated itself to pay Jamison $667,000 for the first contract and $1,042,000 for the second—a total contract price of $1,709,000. The parties' agreement provided for the contingencies of "termination *with* cause" and of "termination *without* cause."[1]

---

[*] Of the U. S. Court of Claims, sitting by designation.

1. The "termination *with* cause" clause stated:

If, in the opinion of the Owner, the Contractor's financial condition shall become impaired or he should persistently or repeatedly refuse or fail to supply enough properly skilled workmen or proper materials, or if he should fail to make prompt payment for material, services or labor, or if he should persistently disregard laws, ordinances or the instructions of the Owner of if he should violate any provision of the Contract, the Owner may, without prejudice to its other rights or remedies, stop the Work forthwith, take possession of the Work, terminate the Contract and finish the Work by whatever method the Owner may deem expedient. In case such right is exercised by the Owner, the amount due the Contractor shall be that portion of the costs incurred beneficial to the Owner's interest. Such sums shall not be payable to the Contractor until final payment would otherwise be due. If the expense of finishing the Work shall exceed the difference between the Contract price and the beneficial costs incurred, the Owner shall, in paying the Contractor, deduct such difference from the amount otherwise due.

In this suit, Jamison asserts that Westvaco terminated Jamison without cause, and further, that after termination the parties reached a settlement agreement which Westvaco subsequently breached. Westvaco, denying the wrongful termination and settlement allegations, argues that the termination was for good cause. Defendant also counterclaims for those costs in excess of Jamison's contract price incurred in hiring another contractor to complete the piping job. The jury rendered a verdict for Jamison in the amount of $607,000, from which decision Westvaco appeals.[2] After examining the record in the light of counsels' briefs and arguments, we conclude that the jury's verdict was excessive, having no support in the evidence, and that a new trial must be ordered as to all issues.

## I. THE SUFFICIENCY OF THE EVIDENCE

Initially, we examine defendant's assertion that the evidence in support of plaintiff's theories of liability—the termination without cause and the settlement counts—was insufficient to justify jury submission.[3] This review is necessary because if we find that none of the propositions which might have supported a verdict in plaintiff's favor have an adequate evidentiary basis, then the verdict would fall notwithstanding the amount of damages returned. In that event, we would not need to reach the question of excessive damages.

## A. The "Termination *Without* Cause" Claim.

■ On September 9, 1969, defendant Westvaco terminated plaintiff Jamison, hiring another contractor to finish Jamison's work. The events occurring between May 1, 1969, and the termination date are much disputed and, not unexpectedly, provide the substance for Jamison's first contention—that the termination was without cause. Jamison asserts that it did not breach the contract, and that if it did breach the contract, the breach is excused because it resulted in all material respects from the hindrance and interference of defendant. Plaintiff draws our attention to evidence supporting its contentions that at the time of termination it was in substantial compliance with the contract; that it could have completed the piping job on time; and that any delays or difficulties ensued from Westvaco's wrongful actions—specifically defendant's failures 1) adequately to prepare the work site, 2) to deliver final drawings at the required times, and 3) to coordinate work among the various contractors. Westvaco denies these contentions, asserting instead that the overwhelming evidence supports its conclusion that plaintiff's work did not constitute substantial compliance, and that Westvaco in no way prevented plaintiff from fulfilling its contractual obligations. Our review of the record convinces us that the facts and inferences do not so strongly favor Westvaco that a jury of reasonable persons could not return a verdict for the plaintiff.

The "termination *without* cause" clause said:
    If the Owner exercises such right for any other than the above reasons [those expressed in the "termination *with* cause" clause], the Contractor shall be entitled to receive a proportionate share of the Contract price based on the amount of the Work completed plus the reasonable expenses of such termination.

2. All figures have been rounded down to the nearest $1000 for purposes of this opinion.

3. The district court unfortunately used a general verdict, thereby obscuring any determination of which count the jurors might have

found decisive. *See* Section IV *infra.* It is possible that the jury, rejecting Jamison's contentions, found that the termination was for cause, but for the reasons suggested at note 27 *infra,* returned a verdict in Jamison's favor. However, we need not analyze the sufficiency of the evidence under the "termination *with* cause" theory because our determinations with respect to the evidence supporting the other two claims and with respect to the excessive damages question render irrelevant to the disposition of this case any decision as to the sufficiency of the evidence on the "termination *with* cause" claim.

*See Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d 365, 373–75. For this reason, we approve the district court's submission of the "termination *without* cause" claim to the jury and denial of Westvaco's motion for judgment notwithstanding the verdict.

### B. The Settlement Claim.

■ Also, as noted, plaintiff argues that at the September 9, 1969, termination meeting the parties entered into a definite, certain and unambiguous settlement agreement under which Westvaco was to pay Jamison the amount of its costs incurred, and that later, Westvaco breached that agreement. Defendant counters that the evidence will not support a jury finding of a legally sufficient settlement contract. Examining the record, we encounter sharply conflicting and somewhat confused testimony with respect to the purported agreement. However, although apparently inconsistent at points, Mr. Jamison's testimony with respect to a cost basis settlement, if believed by the jury, would justify a verdict under the settlement count.[4] Therefore we cannot say that the district court erred in submitting this second claim to the finders of fact. Having found that plaintiff's two contentions provided proper bases for jury consideration and determination of liability, we turn to the question of excessive damages.

## II. THE EXCESSIVENESS OF THE VERDICT

Westvaco argues that the $607,000 jury award so far surpasses "the maximum recovery supported by the evidence and authorized by the Court's instruction" that the district court's refusal of a

new trial amounted to an abuse of discretion. Specifically, defendant asserts that no legally viable calculations under either the "termination *without* cause" or the settlement claim can support the jury's verdict.

In *Glazer v. Glazer,* 5 Cir. 1967, 374 F.2d 390, 413, Judge Wisdom set forth the legal test for evaluating a damages finding in cases such as this. He said:

> Here . . . abuse of discretion is present in the court's failure to grant the defendants' motion for a new trial or for remittitur. The verdict was excessive as a matter of law in that it exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.

*See Natco Inc. v. Williams Brothers Engineering Co.,* 5 Cir. 1974, 489 F.2d 639, 641; *Glazer v. Glazer,* 278 F.Supp. 476, 481–82 (E.D.La.1968). *Cf. United States v. Simmons,* 5 Cir. 1965, 346 F.2d 213, 218.

■ The question for this Court is whether viewing the testimony and exhibits most favorably to the plaintiff, there is within the standard quoted above sufficient evidence as to damages to support a verdict of $607,000. The plaintiff, asserting in oral argument that "there are an infinite number of ways to arrive at the magic figure," outlined three basic approaches.

### A. Termination *Without* Cause

#### 1. The Cost Approach.

According to plaintiff's counsel, the "most plausible way" that the jury might have reached its verdict begins with an evaluation of Jamison's costs under the district court's "termination *without* cause" instruction. That in-

---

4. Mr. Jamison testified:

Well . . . to the best of my memory, Mr. Noble [Westvaco] said, "Ernie [Jamison], I'm sorry that we just don't think we had better go along with you in this particular setup. If you will go back to Atlanta and get your figures together as quickly as possible, we will settle with you."

Now, I had said I would settle with them on a cost basis that would show my concern and my feeling that their best interests should serve, that we would settle on a cost basis, and that is the way I understood it was terminated.

struction, not objected to by either party, provided:

> The measure of Jamison's damages, if any, as a result of the termination of the contracts, should you find that such termination by Westvaco was unjustified, is the proportionate share of the contract price, based on work done, plus the reasonable expenses of the termination, without deduction for the cost of the completion of the work after termination. I further charge you that such damages would include the proportionate share of profits that would have been realized by Jamison if full performance had been permitted. However, in order to recover lost profits, Jamison has the burden of proving to you that it would have made a profit had it been allowed to complete the contract and how much that profit would have been. From that amount, should you determine that Jamison is entitled to recover, should be deducted any payments made by Westvaco to or for the benefit of Jamison.[5]

Jamison's analysis begins with the nonprofit portion of the instruction. Equating the contractual term "the proportionate share of the contract price, based on work done" with those costs actually incurred,[6] plaintiff calls our attention to testimony of $487,000 in direct costs. To this sum, plaintiff adds $43,000 for "allocated overhead" and subtracts $225,000 for payments already made by Westvaco to Jamison.

| | |
|---|---|
| $487.000 | direct costs |
| 43,000 | allocated overhead |
| $530,000 | sub-total |
| (225,000) | prior payments to Jamison |
| $305,000 | sub-total forward |

Plaintiff rightfully increases this subtotal of $305,000 by $76,000 which represents the monies Westvaco admitted owing Jamison on an unrelated contract (Luke).

| | |
|---|---|
| $305,000 | subtotal |
| 76,000 | owed to Jamison (Luke) |
| $381,000 | subtotal forward |

If we accept *arguendo* $381,000 as the amount due under the first part of the "termination *without* cause" jury in-

---

5. The Court gave the following instructions in connection with the other claims:

[With respect to the "termination *with* cause" clause and related counterclaim] if you find that the termination of the contracts by Westvaco was justified and proper, Jamison then would be entitled to recover of Westvaco only that portion of its costs incurred which were beneficial to Westvaco, less any excess expense which was necessary and reasonable for Westvaco to finish the work of Jamison and less any payments made by Westvaco to or for the benefit of Jamison.

. . . [S]hould you find that Westvaco reasonably exercised its termination rights . . . in terminating Jamison and selecting another contractor to complete the work, then you would be authorized in returning a verdict for Westvaco against Jamison for the amount, if any, in excess of the price for which Jamison had agreed to perform the work less the value of the work which Jamison had performed up to the time of termination.

[With respect to the settlement agreement count] if you should find from the evidence that the parties did enter into a definite, certain and unambiguous settlement agreement to pay Jamison the amount of Jamison's direct costs incurred in performing the Wickliffe contracts, then you could find in favor of Jamison against Westvaco in the amount of such direct costs, less payments made by Westvaco to or on behalf of Jamison.

6. For purposes of our analysis, we employ plaintiff's cost theory and its accompanying estimates, as introduced at trial, of its actual costs. Defendant, objecting to these cost calculations, argues that the instruction "the proportionate share of the contract price, based on work done" does not encompass all costs incurred by Jamison. Rather, Westvaco suggests that that phrase means the value to Westvaco of Jamison's work. The difference between these two measures might have been significant given Westvaco's argument that Jamison incurred substantial inefficiencies and cost overruns which created expense for the plaintiff but no corresponding benefit to the defendant. For a discussion of the propriety of using either standard as well as the need for a clearer, more precise instruction see Section III *infra*.

struction, Jamison still must demonstrate an evidentiary basis for the remaining portion ($226,000) of the jury's verdict ($607,000).

| | |
|---|---|
| $607,000 | verdict |
| (381,000) | subtotal |
| $226,000 | shortfall |

Appellee Jamison attempts to make up this shortfall with additions for lost profits and a contingency fund. First, Jamison contends that the evidence before the jury indicated a budgeted profit of 6½% on the first contract and 7% on the second for a total of $116,000.[7] Second, Jamison claims as part of the contract price, a contingency against losses fund of $150,000. Plaintiff argues that to the extent cost overruns were avoided, this $150,000 represents an additional element of damages.

■ Assuming that Jamison offered proof sufficient to demonstrate that if it had been permitted to complete the contract, it would have made a profit and benefited from the contingency fund, we must determine the maximum portion of the $266,000 ($116,000 budgeted profit plus $150,000 contingency fund) which the jury could have added to the verdict. The judge's instruction ordered inclusion of "the proportionate share of profits

that would have been realized by Jamison if full performance had been permitted." Although the district court was woefully imprecise in its charge, the "termination *without* cause" clause, which the instruction must follow, dictates that Jamison receive only that percentage of its realizable profits (and contingency fund[8]) which corresponds to the percentage of "work done." This is true because profits are a part of the contract price, and only that part of the contract price reflecting "work done" is awardable as damages.[9] In other words, the parties did not contemplate that Westvaco would pay Jamison the whole realizable profit and contingency fund if Westvaco terminated plaintiff without cause.[10] Rather, they agreed that plaintiff would receive only that share of the realizable profit and contingency fund which reflected the work component finished.

■ While it is true, as plaintiff observes, that the jury members are arbiters of the percentage of "work done," their decision cannot reach beyond the evidence introduced at trial. *See Natco, Inc. v. Williams Engineering Co.,* 5 Cir. 1974, 489 F.2d 639, 641; *Glazer v. Glazer,* 5 Cir. 1967, 374 F.2d 390, 413. Here an 85% figure is the lowest number the jury could have agreed on which would have eventuated in an award of $607,000.[11]

---

**7.**

| | | |
|---|---|---|
| 6½% × $667,000 (1st contract) = | $ 43,000 | |
| 7% × $1,042,000 (2nd contract) = | 73,000 | |
| | $116,000 | |

**8.** Jamison's argument for inclusion of the contingency fund treats the fund like an element of profit. The court's instruction was silent with respect to the existence of the contingency fund. *See* Section III *infra.* For purposes of this analysis only, we accept Jamison's contention that the contingency fund should be part of the cost based calculations and treat the fund as an additional element of profit.

**9.** Insofar as one might read "proportionate share of profits. . . ." as requiring inclusion of the share of realizable profits rather than a proportion ("based on work done") of the share of realizable profits, we confront a charge which is erroneous for the reason that it is inconsistent with the governing contractual clause. *See* Section III & n. 22 *infra.*

**10.** This manner of calculating damages varies from the normal rules governing an award for breach of a construction contract. *See Crankshaw v. Stanley Homes, Inc.,* 131 Ga.App. 840, 207 S.E.2d 241 (1974); J. Calamari & J. Perillo, *Contracts* § 229 (1970); J. Corbin, 5 *Contracts* § 1094 (1951). The parties may devise and the courts will enforce a contractual provision for damages different from the common law remedy so long as the provision is not unreasonable. *See, e. g., United States v. Harris,* 9 Cir. 1938, 100 F.2d 268, 278.

**11.**

| | | |
|---|---|---|
| 85% × $266,300 = | $226,000 | budgeted profit & contingency fund |
| | 381,000 | previous sub-total |
| | 607,000 | verdict met |

Yet plaintiff points to no evidence nor have we uncovered any evidence on which the jury could have predicated an award anywhere close to 85% of the budgeted profit plus contingency fund.[12]

■ We think that with minor alterations Westvaco's calculations come much closer to the maximum viable numbers while also correctly following the contractual damage formula. Westvaco, indulging all the aforementioned assumptions in Jamison's favor, argues that the maximum percentage of profit which the jury could lawfully grant plaintiff could not exceed 33% of the realizable budgeted profit plus contingency fund.[13] That 33% equals $83,000. When added to the previous subtotal of $381,000, the plaintiff remains $143,000 short of the $607,000 verdict.

| | |
|---|---|
| $381,000 | previous subtotal |
| 83,000 | proportionate share of budgeted profit & contingency fund |
| $464,000 | subtotal |
| $607,000 | verdict |
| (464,000) | subtotal |
| $143,000 | shortfall per Westvaco calculations |

■ Plaintiff, attempting to overcome this deficiency, observes that the district court's instruction, reflecting the language of the contract, called for recovery of termination expenses. Jamison then recounts certain testified to termination expenses—Mr. Jamison's plane trip to Wickliffe and New York; shipping welding fittings to Wickliffe; litigation with another company; and calculations undertaken for settlement purposes. However, even assuming that the aggregate of these four items equals the needed $143,000, plaintiff failed to introduce any evidence as to their dollar amount. The jury cannot be left to speculate as to the size of attorney's fees or the cost of airplane tickets, nor can we correct on appeal counsel's failure to offer the needed evidence.[14]

Finally, still under this first theory, plaintiff contends that even if it cannot offer a viable rationale for the $607,000 damage award, that award "was within the range of evidence," and "not so gross as to shock the conscience of the court." Plaintiff's statements have no significance here. A verdict in excess of the maximum amount calculable from the evidence is not legally "within the range of evidence." In addition, the "shock the conscience standard" is not appropriate in this case. The decisions Jamison cites in support of this test are tort con-

---

**12.** Speculating as to possible jury calculations, Jamison adds $266,000. The use of the $266,000 figure has the virtue from plaintiff's point of view of justifying the jury verdict. However, $266,000 does not represent a number based on the percentage of "work done" but instead is the whole amount (100%) of the budgeted profit plus contingency fund. As noted above, we find no evidentiary justification even for an 85% figure.

For this same reason, among others, we reject Jamison's effort to attach crucial significance to Westvaco's counsel's closing argument to the jury wherein counsel said: "If they [Jamison Company] had done what they said they would do and it had worked for them, they would have gotten $250,000 to keep. . . ."

**13.** Westvaco figures that if plaintiff received credit for its Wickliffe costs ($487,000), then the "proportionate share of the contract price, based on work done" must equal the ratio of those costs ($487,000) on the one hand to the total contract price ($1,709,000) less the budgeted profited ($116,000) and contingency fund ($150,000) on the other hand.

$$\frac{\$487,000}{\$1,709,000 - \$266,000} \qquad \frac{\$487,000}{\$1,443,000} = 33\%$$

**14.** In its brief, plaintiff asserts "[w]hile no precise figures were presented as to the amounts of these expenses, the jury could easily and properly have valued these expenses in accordance with the lower court's charge." Plaintiff not only does not tell us how the jury might have valued the individual expenses, but also neglects to inform the appellate court of the actual total expense. It is possible that the termination costs might not even equal the $143,000 discussed above as necessary to reach the $607,000 verdict.

troversies.[15] There, because of the inherent difficulty in valuing elements of damage such as pain and suffering, the more precise arithmetic characteristic of a contract case such as this is not usually possible. Thus, we reject plaintiff's proposed test and adhere instead to the standard set out earlier requiring that the damages not exceed the evidence before the jury. *See Glazer v. Glazer,* 5 Cir. 1967, 374 F.2d 390, 413; *Glazer v. Glazer,* 278 F.Supp. 476, 481–82 (E.D.La. 1968). *See also Aircraft & Engine Maintenance v. I. E. Schilling Co.,* 5 Cir. 1965, 340 F.2d 286.

### 2. The Time Elapsed Approach.

■ Appellee's second theory for supporting the verdict argues that the jury could have decided that "a proportionate share of the work done was reasonably related to the time spent on the job by Jamison Company." Continuing, Jamison argues that because of the time elapsed under the first contract represented 4/7 of the contractually allocated time for that job and 4/10 of the time provided for the second contract, the jury could have awarded those fractional parts of the actual contract price. This manner of calculation permits a maximum verdict of nearly $800,000.[16] Assuming, without deciding, that a jury instruction accurately reflecting the parties' intention as expressed in the "termination *without* cause" clause permits a time elapsed approach,[17] we still find difficulties with Jamison's analysis here. We encounter first, a lack of evidence relating the time elapsed under the contract to the work actually done by Jamison, and second, the failure of the evidence to establish the relationship, if any, between the work done and the dollar value of that work. Absent evidence on these points, plaintiff's second theory must fail.

### 3. The Previous Success Approach.

■ Appellee's third effort to buoy the verdict begins with a recitation of testimony of plaintiff's previous commercial successes. Plaintiff then reasons that this evidence "fully supported a finding that . . . Jamison Company would have completed the Wickliffe project with flying colors and enjoyed its just deserts." However, even if we accept previous successes as probative of plaintiff's likely profit realization,[18] the crucial question of the proportionate share of those realized profits allocable to Jamison remains unanswered. Moreover, the only case cited by plaintiff, *Dyal v. Wimbish,* 5 Cir. 1941, 124 F.2d 464, involved a warehouse leased under the same conditions and to the same party in each of the four previous years. The prior years' profit was known and introduced at trial in that case. Here, the plaintiff did not inform the jury of the profit on its previous successes nor on appeal did it refer us to any evidence indicating *Dyal*-like congruency between the Wickliffe project and plaintiff's former jobs. Jamison has extended the *Dyal* concept beyond any wavelength to which we are receptive.

### B. The Settlement Count

■ The district court correctly instructed the jury that it could award

---

15. *Brown v. Louisiana & Ark. Ry.,* 5 Cir. 1970, 429 F.2d 1265; *Massachusetts Bonding & Ins. Co. v. Abbott,* 5 Cir. 1961, 287 F.2d 547.

16.

$$\begin{array}{r} \$667,000 \\ \times \quad .5714 \\ \hline \$381,000 \end{array}$$ contract 1 price (4/7—time elapsed)    $381,000

$$\begin{array}{r} \$1,042,000 \\ \times \quad .4 \\ \hline \$ 417,000 \end{array}$$ contract 2 price (4/10—time elapsed)    $407,000
$709,000

17. *See* Section III *infra.*

18. In fact, our former cost analysis assumed a jury finding that plaintiff would have realized the full measure ($266,000) of budgeted profit and contingency funds had it been permitted to complete the contracts. *See* Section II.A. *supra.* However, plaintiff still has failed to justify the needed 85% allocation of those potentially realizable profits.

under the settlement claim "Jamison's direct costs . . . less payments made by Westvaco to . . . Jamison."[19] For purposes of its argument under the "termination *without* cause" clause, plaintiff noted direct costs of $487,000 and prior payments of $225,000. Assuming *arguendo* for purposes of the settlement theory that plaintiff should benefit from its claim to "allocated overhead" ($43,000), and adding in the agreed to Westvaco liability on the Luke project ($76,000), Jamison remains $226,000 short of the $607,000 "magic figure." Presumably realizing its predicament under the settlement count, Jamison does not argue that the evidence of settlement damages supports the jury's verdict. On the basis of our calculations above, we agree with that conclusion.

| | |
|---|---|
| $487,000 | direct costs |
| 43,000 | allocated overhead |
| 76,000 | owed to Jamison (Luke) |
| $606,000 | |
| (225,000) | prior payments to Jamison |
| $381,000 | Total per settlement claim |
| $607,000 | verdict |
| (381,000) | total per settlement claim |
| $226,000 | shortfall |

19. *See* note 5 *supra.*

20. *See* text at note 5 *supra.*

21. *See* note 1 *supra.*

22. Other instances of ambiguous and potentially misleading language in the instruction delivered at the first trial include the judge's statement, "I further charge you that *such damages would include* the proportionate share of profits that would have been realized by Jamison if full performance had been permitted." To compute damages correctly, the jurors would have had to figure out that "proportionate share of profits" means not that part of the profits which were realizable but instead that portion of the realizable profits reflecting the percentage of "work done." *See* note 9 *supra.* If the jurors had reached this stage, they would have had to understand that they were not to add the just calculated "proportionate share of profits" to the earlier calculated total representing "the proportionate share of the contract price, based on work done." Instead, they were to leave unchanged the "proportionate share of the contract price, based on work done" unless the realizable profits were less than 100% of the anticipated profits. If the

Having examined the plaintiff's arguments, we remain unconvinced that any set of calculations with a rational basis in the evidence can justify the jury's $607,000 award. Plaintiff claims many roads lead to his Rome; yet we encounter only insurmountable roadblocks and unending detours. Therefore, this Court finds that the district court abused its discretion in denying appellant's motion for a new trial.

## III. THE TERMINATION WITHOUT CAUSE INSTRUCTION

The controversy described at note 6 *supra* concerning Jamison's use of figures reflecting costs incurred rather than value rendered underlines the unfortunate ambiguity of the district court's "termination *without* cause" instruction.[20] As the remainder of this section demonstrates, the instruction is so imprecise that we cannot say that it properly reflects the governing contractual clause.[21] Moreover, it is deficient with respect to the guidance required for jury deliberations.[22] *See generally*

realizable profits had been less than 100% of the anticipated profits, then the jurors would have had to reduce the "proportionate share of the contract price, based on work done" by the amount equal to the unrealizable profits times the percentage of "work done."

Another problem involves the trial court's statement, "From that amount . . . should be deducted any payments made by Westvaco to or for the benefit of Jamison." It is not clear whether "that amount" refers a) to the immediately preceding discussion of the "proportionate share of the profits that would have been realized by Jamison if full performance had been permitted," or b) to the earlier mentioned "proportionate share of the contract price, based on work done." If the jurors had determined that the reference was to the immediately preceding discussion (a above) and if the prior payments had exceeded the amount of the realizable profits reflecting the percentage of "work done" (i. e. "the proportionate share of the profits"), then a negative number would have resulted upon juror subtraction. Unless the jurors carried this negative number back and deducted it from their calculation of the "proportionate share of the contract price, based on work done,"

*McClendon v. Reynolds Electrical & Engineering*, 5 Cir. 1970, 432 F.2d 320; *Choy v. Bouchelle*, 3 Cir. 1970, 436 F.2d 319, 325; C. Wright & A. Miller, *Federal Practice & Procedure* § 2556 (1971). Thus, even if Jamison had justified the verdict under one of its three analyses,[23] we would remand for a new trial on the alternative ground of an inadequate jury instruction. *See generally Delancey v. Motichek Towing Service*, 5 Cir. 1970, 427 F.2d 897, 901–902; C. Wright & A. Miller, *supra* at § 2558. We realize that neither party objected to the instruction at trial or on appeal. Normally this Court does not order a reversal in the absence of such objections. *See e. g., Clark-Warwick, Inc. v. National Fire Ins. Co. of Hartford*, 5 Cir. 1961, 291 F.2d 828, 830. However, in certain limited circumstances, we have the power to review a trial court's charge *sua sponte*. *See, e. g., Sheppard Federal Credit Union v. Palmer*, 5 Cir. 1969, 408 F.2d 1369, 1371–73; *Chagas v. Berry*, 5 Cir. 1966, 369 F.2d 637, *cert. denied*, 389 U.S. 872, 88 S.Ct. 161, 19 L.Ed.2d 154. *See generally* C. Wright & A. Miller, *supra* at § 2558. Here, the jury may have correctly interpreted the instruction, but then erroneously based their calculations on evidence not in the record. In this event, we would reverse on the basis of Section II *supra*. Alternatively, the jury, because of the charge's vague and misleading language, may have followed an instruction inconsistent with the contractually dictated damage formula. If this is so, then the deficient charge is likely responsible for an incorrect verdict which in itself creates a substantial injustice recognizable by this Court on its own initiative.

Although noting the charge's fatal deficiencies ourselves, we think that the district court, pursuant to its duty to interpret the contract, *see generally* S. Williston *Contracts* § 601 (3 ed. 1961), ought to have the first opportunity to draft a proper "termination *without* cause" instruction on retrial. This approach commends itself principally because the necessary prior determination of the parties' intent often depends on evidence relating to contract formation, customary usages, and other surrounding circumstances which may be presented at a new trial and therefore is not before us now. Although we do not here versify a charge, the importance of this question at retrial merits a few brief remarks.

We consider first the problem raised by the cost incurred-value rendered dispute. *See* note 6 *supra*. Initially, the language of the two termination clauses suggests that when the parties intended to use the "value to Westvaco" measure, they wrote, as we encounter in the "termination *with* cause" clause,[24] "that portion of the costs incurred beneficial to the Owner's interest." [Emphasis added.] The "termination *without* cause" clause [25] employs different language ("a proportionate share of the Contract price based on the amount of Work completed . . . .") and therefore, at least at the outset, seems to dictate a different test. Whether the intended standard for calculating damages under the "termination *without* cause" provision is cost-incurred, percentage of actual work completed, time expended on the job, value rendered, or some other criterion may de-

---

Westvaco would have lost the benefit of its prior payment to the extent of the negative amount. Even if we do not demand punctilious exactitude, we cannot in conscience permit vague inexactitude to be the focal point of the jury's verdict. Finding the instruction troublesome after our own close scrutiny, we have grave doubts that all jurors would have understood the required calculations after hearing the court's words.

Finally, we note that the district court sent the actual contract to the jury room. However, the availability of the contractual language cannot be said to obviate the potential confusion discussed above.

**23.** *See* Sections II.A.1., II.A.2., & II.A.3. *supra*.

**24.** *See* note 1 *supra*.

**25.** *Id.*

pend on the factors enumerated above as well as a further parsing of the contract's literal language. Once the district court arrives at a decision as to the proper test, that standard should be incorporated in an instruction replacing the vague "work done" phrase employed in the earlier charge.

We also note that the "termination *without* cause" clause speaks of a percentage "of the contract price." The District Court should inquire as to whether the parties intended 1) a percentage of the *entire* contract price ($1,709,000) or 2) a percentage of the non-profit element of the contract ($1,709,000 less the contractor's expected profit margin) *plus* a separate addition of the same percentage of that part of the profit element which the contractor can demonstrate he would have realized. The second measure reflects both the instruction given at the first trial and the general contract concept that profits can be awarded only if the jury finds a reasonable certainty that they would have been earned. *See generally* S. Williston, *Contracts* § 1345 (3 ed. 1968). However, by the literal language "a proportionate share of the Contract price," the parties may have intended the first measure—that is, a portion of the contract price without regard to any division into profit and non-profit components and consequently without consideration of the likelihood of the contractor's actually achieving a profit.

The same analysis would apply with respect to Jamison's claim to another element of damages—a contingency against losses fund.[26] The charge at the first trial was silent with respect to the contingency fund, thereby reinforcing the lack of clarity and guidance found by this Court. Similarly, the trial judge should examine the possibility of instructing the jury with respect to Jamison's claim to "allocated overhead."

■ We realize that this case is not simple, and the charge is not easily con-

structed. Yet determinations of contract damages cannot be a guessing game. The butcher, the baker, and the candlestick maker, and all who although unversed in the jargon of today's complex contracts comprise our juries cannot be left to founder on the shoals of inexactitude or to experience the confusion engendered by the dim light of a vague instruction. The district court and the parties must provide the jury with the instructional equivalent of the mariner's compass and sea-lane map in order that the lay jurors might successfully complete their voyage.

We realize that all of the points discussed above raise difficult questions requiring careful consideration. We hope that at retrial the district court, in the light of all of the testimony and evidence, will resolve these questions and thereafter translate the answers into a jury charge more precise and more helpful than the one pronounced at the original trial.

## IV.  THE USE OF SPECIAL INTERROGATORIES

Because this litigation is nearly six years old and because the original trial lasted three weeks, we hesitate to require a new trial on all issues. However, the district court's use of a general verdict leaves us no alternative.

■ Generally, in cases such as this, the appellate court avoids a wasteful retrial of the entire controversy through the use of one of two devices. First, the court can order remittitur, setting the approved figure itself, *see generally* C. Wright & A. Miller, *Federal Practice & Procedure* § 2820 (1973), or remanding to the district court for that determination. *See, e. g., Natco, Inc. v. Williams Brothers Engineering Co.*, 5 Cir. 1974, 489 F.2d 639, 641. Yet without knowing whether the jury found for the plaintiff on the "termination *without* cause" or on the

---

**26.**  *See* note 8 *supra*.

settlement count,[27] an answer obscured by the general verdict, we cannot calculate the maximum recovery on which to base the remittitur. The second device for avoiding a full retrial is a partial new trial limited to the damage issues. *See generally* C. Wright & A. Miller, *supra* at § 2814 (1973). Unfortunately, our uncertainty as to the jury's resolution of the liability issue also forecloses this method. Without a prior determination of the basis for liability, the district court on remand for a partial new trial would be unable to instruct the jury as to damages. In other words, partial remand is permissible only where one has a definite furcation. Here, the contractual obligations and damages flowing from their breach are not separable, but rather are inextricably bound together. They are not independent, but are interdependent. Justice commands that we sunder them not, notwithstanding our quest to avoid unnecessary and repetitious judicial efforts.

Chief Judge Brown has on many occasions considered the problems discussed above and wisely expounded on the role to be played in their solution by properly administered Rule 49(a) special interrogatories.[28] *See* J. Brown, *Federal Special Verdicts: The Doubt Eliminator*, 5 Cir., 44 F.R.D. 338 (1968); *In re Double D Dredging Co.*, 5 Cir. 1972, 467 F.2d 468, 469 n. 3; *Thrash v. O'Donnell*, 5 Cir. 1971, 448 F.2d 886, 889–92; *Little v. Bankers Life & Casualty Co.*, 5 Cir. 1970, 426 F.2d 509, 512 (Brown, .C. J., concurring); *Horne v. Georgia So. & Fla. Ry.*, 5

Cir. 1970, 421 F.2d 975, 980 (Brown, C. J., concurring). In speaking of this "wonder to behold," the Chief Judge has noted how "confusion," "appellate uncertainty," and "additional proceedings" have been avoided by addressing special interrogatories to the jury. *See Little*, 426 F.2d at 512. In a complicated case such as this, the special interrogatory device localizes and focalizes the specific problems and issues whereas a general verdict often permits improper jury meandering at trial and presents impossible matching efforts on appeal.

Admittedly, the decision to use Rule 49(a) remains within the informed discretion of the trial court. *Miskell v. Southern Food Co.*, 5 Cir. 1971, 439 F.2d 790; *see* C. Wright & A. Miller, *Federal Practice & Procedure* § 2505 (1971). However, we would be remiss were we not to remind the District Judge that in lengthy multi-issue cases such as this one, the additional exertion initially required to instruct the jury pursuant to that rule is miniscule when compared to the efforts which the district court, as well as the parties, will expend on retrial. We believe that special interrogatories would be particularly appropriate here.

After analyzing the contract, evidence, charge, and jury verdict with their many possible alternatives, asymetrical incongruencies, potential solecisms, and error compounded upon error, we have no doubt but that the jury verdict was ei-

---

**27.** Although unlikely, it is not inconceivable that the jury premised its verdict on neither of the above theories but instead on the "termination *with* cause" clause. Under that provision, the district court had instructed the jury to award Jamison those "costs incurred which were beneficial to Westvaco, less any excess expense which was necessary and reasonable for Westvaco to finish the work of Jamison. . . ." The jury might have agreed on $607,000 in beneficial costs to Westvaco (an amount not supported by the evidence) and also found unreasonable the excess costs for finishing the job claimed by Westvaco. Here again, the general verdict forecloses ascertainment of the liability basis of the jury's award.

**28.** Rule 49(a) states in pertinent part:

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.

ther aleatory or illogical. Contrary to plaintiff's assertions of an "infinite number of ways" to reach the "magic number," we can find none with proper support in the evidence. Plaintiff's prestidigitatious efforts have not been successful. It seems that even a Houdini with numbers confronting plaintiff's chore on appeal would have come away perplexed. Nor can we permit damage speculation where the formula for calculation is articulable and definable. Flexibility beyond the range of the evidence will not be tolerated. In addition, we observe that the jury's excessive generosity may well have resulted from their understanding of an ambiguous and misleading instruction. Both plaintiff's inability to justify the verdict and the flawed instruction require that we order a new trial as to all issues. We are never eager to overturn a jury's verdict, especially when it follows an enormous consumption of judicial resources including a three week trial. Yet we cannot stand mute and affirm the untenable. If a complete and careful study of the record finds us confused in determining how the jury arrived at its decision, we must conclude that the jury was confused in its efforts. Therefore, it is with great reluctance, but firm conviction, that we reverse this case.

Reversed and remanded.

NICHOLS, Associate Judge (specially concurring).

I concur in Judge Goldberg's able and enlightening opinion. As to part I B (The Settlement Claim), however, I would like to add this: It may be acceptable to assume, *arguendo*, there was evidence to go to the jury that the parties made a settlement agreement, since we hold such agreement anyway fails to support the verdict as returned, but I feel considerable doubt about the testimony quoted in fn. 4. Whether the evidence most favorable for plaintiff shows an enforceable agreement is not a question of fact for the jury, but one of law for the judge. Suppose the offer and acceptance were to "settle on a cost ba-

sis", I read this as only an undertaking to negotiate a settlement on the basis of cost figures. If such negotiation had occurred, the parties would have had several matters to decide, on which their minds had not yet met, e. g., was the basis direct costs only, as the trial judge instructed, or all costs?

As to part II, text after fn. 7, the so-called "contingency fund" was only the percentage usually added by a construction contractor to his cost estimates in preparing his bid, to allow a cushion for the operation of Murphy's law. It does not represent profit the bidder expects to realize, but rather profit he expects to lose, one way or another. The record showed here, it was almost all lost even before termination. I would not add it to the expected profit even *arguendo*, as it is not properly awardable.

If, contrary to my view, the parties made a valid and enforceable agreement settling plaintiff's claim, it would be a defense against that claim so far as founded on either branch of the termination clause. The questions for the special verdict should be so framed as to effectuate this consequence.