KUEHNE & NAGEL (AG & CO),
Plaintiff–Appellant
Cross–Appellee,

v.

GEOSOURCE, INC., Defendant–Appellee
Cross–Appellant.

GEOSOURCE, INC., Plaintiff–Appellee
Cross–Appellant,

v.

PANALPINA WELTTRANSPORT
G.m.b.H., Defendant–Appellant
Cross–Appellee.

No. 88–2061.

United States Court of Appeals,
Fifth Circuit.

June 5, 1989.

James J. Sentner, Jr., Antoinette van Heughten, Houston, Tex., for plaintiff-appellant, cross-appellee.

G. Wesley Urquhart, Frank Mitchell, Houston, Tex., for defendant-appellee, cross-appellant.

Before WISDOM, GARWOOD and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This litigation arose out of the arrangements three freight forwarders—Kuehne & Nagel (AG & Co.) (Kuehne & Nagel), Panalpina Welttransport GmbH (Panalpina) and SGS Controll Co. mbH (SGS)—made with Geosource, Inc., and Ucamar Shipping & Transportation (Cayman) Ltd. (Ucamar) to ship cargo. For reasons that follow, we remand all of the claims for jury trial.

## I. Background

The dispute in this case stems from an ill-fated deal between the three European freight forwarders and Ucamar to transport goods on through bills of lading from Europe to the Middle East. The bills of lading called for Ucamar to ship the forwarders' cargo by vessel from Northern Europe to Turkey, and then over land by truck to Iran. The problem began when the cargo was stranded in Turkey and the journey's second leg was interrupted. After considerable delay, the forwarders made alternate arrangements for delivery of the cargo. A flurry of suits and counter-suits followed.

Geosource, Inc., a Houston-based company, owns all shares of Geosource Co. (Cayman) Ltd., a Cayman Island corporation; Geosource (Cayman) owns half of Ucamar's shares. Ristram Seetransport Management GmbH (Ristram (Germany)) owns the other half of Ucamar's shares. Geosource (Cayman) and Ristram (Germany) formed Ucamar in July 1982.

Although Ucamar issued the through bills of lading, it arranged for other companies to handle various functions essential to the shipment of the cargo. Ristram (Germany) contracted to act as Ucamar's general managing agent in Europe and oversee the sea leg of the transport from Europe to Turkey. Ristrans (Turkey), which owned part of Ristram (Germany), contracted to provide Ucamar with documentation, licenses and stevedoring services, and facilities to receive the cargo in Turkey. It also agreed to supervise the overland leg of the route from Turkey to the Middle East. Geosource, Inc., contracted to manage Ucamar's operations in Turkey for a fee based on a percentage of Ucamar's gross annual revenues.

In November 1982, Geosource, Inc., sponsored a promotional meeting at a hotel in Hamburg, West Germany, to drum up business for Ucamar from European freight forwarders. After the presentation and some followup negotiations, the three freight forwarders involved in this litigation contracted to ship cargo from Europe to the Middle East on Ucamar's through bills of lading. The forwarders alleged that Geosource, Inc., which enjoyed a good reputation, promised to control the Ucamar venture and provide financial support. The forwarders also asserted that Geosource failed to inform them at the meeting that Ucamar had been experiencing serious operational and financial problems since September 1982.

The forwarders' cargo was loaded on vessels in late 1982. But when the vessels called at Turkish ports in March 1983, Ucamar was unable to unload some of the cargo; other portions sat in storage awaiting clearance through Turkish customs and transportation to the Middle East. Some of the forwarders' cargo remained aboard ship or in port at Iskenderun, Turkey, for several weeks; the remaining cargo was diverted to different ports.

Ucamar explained that its inability to unload the cargo, clear it through Turkish customs and transport it stemmed from a feud that erupted in early 1983 between Ucamar and its Turkish contacts, who controlled the facilities and equipment for on-carriage at two Turkish ports. Geosource presented evidence that by March 1983, Ristrans (Turkey) refused to cooperate with Ucamar. Geosource also presented testimony that a principal in Ristram (Germany) and Ristrans (Turkey) orchestrated threats and violence against Geosource management personnel in Turkey, prompting them to flee the country.

Geosource contended that Ucamar's inability to obtain the cooperation of Turkish officials was largely caused by the forwarders' failure to prepay freight as agreed. Geosource argued that the forwarders' failure to prepay freight was particularly damaging because it deprived Ucamar of critically needed working capital. Geosource also complained that the forwarders diverted funds due Ucamar to Ucamar's Turkish adversaries.

The forwarders counter that they simply acted to protect their cargoes, which were languishing in Turkish ports; when it became apparent that Ucamar did not have the necessary papers and clout to land the cargo, the forwarders were forced to find someone who did and pay them to land the cargo and transport it over land. The forwarders also point to evidence that Ucamar could not perform the overland leg of the shipment in any event because it did not have sufficient trucks to do so, contrary to Geosource's representations at the November promotional meeting in Hamburg.

In the first round of litigation, SGS and Panalpina sued Geosource and Ucamar in the Southern District of Texas in Civil Action No. H–83–5569. This court affirmed the dismissal of that suit for lack of jurisdiction. *Panalpina Welttransport GmbH v. Geosource, Inc.*, 764 F.2d 352 (5th Cir. 1985). We held that the suit between alien plaintiffs and the alien defendant Ucamar lacked diversity.

In round two of the litigation, Kuehne & Nagel filed Civil Action No. H–83–5913 against Geosource in October 1983, alleging that Geosource breached the through bills of lading as Ucamar's alter ego and fraudulently induced Kuehne & Nagel to contract with Ucamar. Geosource counterclaimed on grounds that Kuehne & Nagel tortiously interfered with the Geosource–Ucamar management contract. Geosource sought to dismiss the Kuehne & Nagel action for lack of diversity. But the district court concluded that Kuehne & Nagel's amended petition alleged a maritime tort that satisfied the court's admiralty jurisdiction.

Geosource filed its own suit, Civil Action No. H–85–2082, against SGS and Panalpina for tortious interference with the Geosource–Ucamar management agreement. SGS and Panalpina asserted compulsory counterclaims against Geosource as Ucamar's alter ego for breach of the through bills of lading, and against Geosource for fraudulently inducing the forwarders to contract with Ucamar. After the district court consolidated the two suits for trial, the parties agreed to try Geosource's tortious interference claim against the forwarders to a jury. They also agreed that Texas law governed. The forwarders' claims against Geosource were simultaneously tried to the court sitting in admiralty. Geosource objected to this latter action, contending that admiralty jurisdiction was lacking and thus a jury trial was required on the forwarders' claims.

In December 1986, the jury found that Kuehne & Nagel and Panalpina had tortiously interfered with the Geosource–Ucamar management agreement, and returned a verdict in Geosource's favor for $500,000 in compensatory damages. The jury also awarded Geosource $6 million in punitive damages against Kuehne & Nagel, and $9 million in punitive damages against Panalpina. The jury exonerated SGS on Geosource's tortious interference claim.

On the claims against Geosource, the court concluded that Geosource fraudulently induced the forwarders to contract with Ucamar and awarded damages. It also found that Ucamar, acting as Geosource's alter ego, breached the contracts of af-

freightment. But the court attributed Ucamar's breach to the "violence and sabotage" of Ristrans (Turkey) and excused Ucamar's performance as commercially impracticable.

Based on the jury verdict, the district court entered judgment awarding Geosource $500,000 in compensatory damages against Kuehne & Nagel and Panalpina for tortious interference. After reducing the jury's punitive damage awards, the court entered judgment for punitive damages in favor of Geosource for $2 million against Kuehne & Nagel and $3 million against Panalpina. On the issues tried to the court, the district court entered judgment against Geosource and in favor of Kuehne & Nagel for $699,577.50 in compensatory damages and $1,399,155 in punitive damages. It awarded SGS $307,273.53 in actual damages and $614,547.06 in punitive damages. It also awarded Panalpina $298,276.52 actual damages and $596,533.04 in punitive damages.

Kuehne & Nagel and Panalpina appeal the money judgment against them. All three forwarders appeal the district court's dismissal of their breach of contract actions. Geosource appeals the money judgment rendered against it and the district court's order reducing the punitive damages.

## II. Jurisdiction

■ This appeal raises a myriad of intertwined issues concerning the validity of the judgment entered in the consolidated actions. However, before we reach the merits of those issues, we first must address the district court's jurisdiction. In so doing, we agree with the forwarders that we must view each consolidated case separately to determine the jurisdictional premise upon which each stands. *See McKenzie v.*

United States, 678 F.2d 571, 574 (5th Cir. 1982); Wright & Miller, *Federal Practice & Procedure* § 2382 at 254–55 (1971).[1]

In *McKenzie*, the plaintiff appealed from adverse judgments in two actions that arose out of the same facts and were consolidated for trial. 678 F.2d at 572. One suit was filed in the United States district court under the Federal Tort Claims Act. The other was a negligence action initially filed in a Louisiana state court that was removed two years later to federal court and consolidated with the federal suit. The two suits involved the same plaintiff but different defendants. *Id.* at 573. The court reviewed the federal suit on the merits but vacated the judgment on the removed suit because there was no jurisdiction over that action. *Id.* at 574. This court stated:

> At best, it is contended that consolidation with a pending federal action—McKenzie's companion suit against the United States under the Federal Tort Claims Act—cured any jurisdictional defect. But consolidation does not cause one civil action to emerge from two; the actions do not lose their separate identity; the parties to one action do not become parties to the other ... As a consequence, the subsequent consolidation of [plaintiff's] two lawsuits did not give the district court subject matter to adjudicate his [removed action].

*McKenzie*, 678 F.2d 571, 574 (5th Cir.1982) (citations omitted). We now consider the jurisdictional basis for each of the consolidated actions.[2]

### A. *No. H-83-5913*

In this action, Kuehne & Nagel sued Geosource and invoked the court's diversity jurisdiction. Two years later, Kuehne &

---

1. Our separate analysis of each consolidated case to determine whether we have jurisdiction does not affect the principle that parties must satisfy Fed.R.Civ.P. 54(b) when appealing from a judgment adjudicating less than all claims of all parties in a consolidated action, *Ringwald v. Harris,* 675 F.2d 768, 770–71 (5th Cir.1982); or that a district court, pursuant to Fed.R.Civ.P. 42(a), may consolidate all claims for disposition by a single judgment. *See Harcon Barge Co. v.*

*D & G Boat Rentals, Inc.,* 746 F.2d 278 (5th Cir.1984), *reh'g en banc* 784 F.2d 665 (5th Cir. 1986).

2. This appeal is docketed under a single number in this court. Therefore, to differentiate between the two actions on appeal, we refer to the separate docket numbers assigned in the district court.

Nagel amended the suit to add Ucamar as a named defendant under the court's admiralty jurisdiction. Kuehne & Nagel predicated its claim of admiralty jurisdiction on two theories: (1) breach of maritime contract (bills of lading); and (2) a maritime tort of fraudulent inducement to contract. Geosource counterclaimed and alleged that Kuehne & Nagel tortiously interfered with its management services contract with Ucamar. The district court ruled that admiralty jurisdiction could not be based on a contract theory because the contract was not wholly maritime in nature, and the contract's maritime feature was inseparable from its non-maritime feature. However, the district court did conclude that Kuehne & Nagel's fraudulent inducement assertions alleged a maritime tort and the court invoked admiralty jurisdiction on that theory.

### 1. Maritime Tort

■ The district court applied the two-prong test of *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), to conclude that admiralty jurisdiction existed. *Executive Jet* teaches that the court's admiralty jurisdiction will attach in tort cases if the alleged wrong occurs on navigable waters (situs) *and* bears a significant relationship to traditional maritime activity (nexus). *See, e.g., Casaceli v. Martech International Inc.*, 774 F.2d 1322, 1328 (5th Cir.), *cert. denied sub nom. Casaceli v. Cheramie B. Truc 11 Inc.*, 475 U.S. 1108, 106 S.Ct. 1516, 89 L.Ed.2d 914 (1985). The district court determined that Geosource's alleged fraudulent inducement to contract "took effect" on navigable waters because, after the inducement and the contract's breach, some of the cargo under contract "remained on board vessels [at sea] awaiting discharge." Thus, the district court reasoned, "although the alleged misrepresentations occurred on land, the 'effect' of these misrepresentations were manifested at sea." *Kuehne & Nagel*, 625 F.Supp. 794, 798–99 (S.D.Tex.1986).

Kuehne & Nagel, in urging us to affirm the district court's determination that the situs prong of *Executive Jet's* test is satisfied, relies heavily on *Carroll v. Protection Maritime Insurance Co., Ltd.*, 512 F.2d 4 (1st Cir.1975). In *Carroll*, the plaintiffs, who were seamen and commercial fishermen, sued several insurers for tortious interference with the employment contracts they had entered. The plaintiffs alleged that the insurers "black-listed" them because they had filed personal injury actions against previous employers. The defendants allegedly sent lists of personal injury claimants to plaintiffs' employers and prospective employers. As a result, the plaintiffs were denied employment.

The First Circuit found that the action fell within the court's admiralty jurisdiction because the "impact" of the insurers' land-based action—providing the lists to employers—"at least where existing employment was terminated, was felt in the operations of the affected vessels at sea. They not only have sailed without the black-listed plaintiffs but without the owners and officers of the affected vessels having exercised their unrestricted choice of crewmembers." *Carroll*, 512 F.2d at 8.

This court has applied the "impact" analysis in several situations. We found situs present where a gun was fired from land, but the bullet struck and injured a poacher on a vessel. *Kelly v. Smith*, 485 F.2d 520 (5th Cir.1973), *cert. denied sub nom. Chicot Land Co. v. Kelly*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). Situs was also satisfied where the components of a ship's navigational system, negligently manufactured on land, caused a collision on the high seas. *Sperry Rand Corp. v. R.C.A.*, 618 F.2d 319 (5th Cir. 1980). And we found the situs element established where workers who contracted asbestosis were exposed to asbestos both on land and on vessels lying in navigable waters. *Woessner v. Johns–Manville Sales Corp.*, 757 F.2d 634, 638 (5th Cir. 1985).

We glean further guidance from *Parker v. Gulf City Fisheries*, 803 F.2d 828 (5th Cir.1986), in which a seaman became ill at sea. The seaman's wife learned of her husband's illness, contacted the defendant physician, obtained medical advice and re-

layed that advice to her husband. The seaman's condition worsened after the seaman allegedly followed the physician's advice. Shortly after returning to shore, the seaman suffered a massive stroke allegedly due in part to faulty advice from the physician. This malpractice action against the physician followed. Although the physician rendered his advice on land, we concluded that *Executive Jet*'s situs requirement was satisfied because the impact of the defendant's alleged negligent advice occurred at sea where the seaman's condition worsened.

The land-based acts directly produced a major injury on navigable waters in the above cases. Firing a rifle from shore that wounds another at sea, manufacturing a defective component that causes the vessel to sink, or aggravating symptoms at sea through medical advice rendered from shore all demonstrate a direct effect on navigable water from land-based acts.

■ We cannot conclude, however, that Geosource's alleged misrepresentations directly produced an injury at sea. Geosource's alleged misrepresentations to the forwarders that induced them to enter the contracts were made at a Geosource-sponsored meeting at a hotel in Hamburg, West Germany. Thus, the tortious acts occurred before Kuehne & Nagel signed the contract. The misrepresentations had their desired "effect" on land when they prompted Kuehne & Nagel to sign the contracts of affreightment. Kuehne & Nagel's injury resulted from Ucamar's failure to deliver the cargo to its destination. Kuehne & Nagel alleged no damage to the cargo while it was aboard ship except to the extent that some of it remained on vessels awaiting permission to clear customs. Other portions of the cargo were unloaded but were placed in storage because funds were unavailable to pay for trucks and drivers to transport the cargo. The fact that some of the cargo sat on the vessels is incidental to the forwarders' damages, most of which related to the added cost of the overland transportation. At best, the injury, if any, that occurred on navigable water was too remote from the tortious act to meet the situs requirement for admiralty jurisdiction.

Kuehne & Nagel alternatively argues that it need not meet the "situs" requirement when a tort results in the creation of a maritime contract. This argument is also rooted in *Carroll, supra.* The First Circuit found that the district court had admiralty jurisdiction over insurers who circulated to current and prospective employers the names of seamen who had asserted claims against their employers. The court concluded that the insurers interfered with "present and potential maritime contractual relationships—traditional concerns of admiralty—[so] as to fall within that jursidiction." *Carroll,* 512 F.2d at 8–9.

The district court followed this reasoning and observed that Geosource's fraud caused Kuehne & Nagel to enter a "mixed contract." It concluded that "the intentional tort was so interwoven with a maritime contractual relationship (at least in part) as to fall within admiralty jurisdiction." *Kuehne & Nagel,* 625 F.Supp. at 799 n. 6.

■ We disagree. A party to a contract with strong maritime implications still must satisfy *Executive Jet*'s situs requirement when seeking to predicate jurisdiction on a maritime tort. *See Wiedemann & Fransen APLC v. Hollywood Marine, Inc.,* 811 F.2d 864 (5th Cir.), *reh'g denied,* 815 F.2d 700 (1987). In *Wiedemann,* the plaintiff asserted that a contingent fee agreement between an injured seaman and his attorney constituted a maritime contract, so that tortious interference with such a contract was a maritime tort. Even though we "assum[ed] ... that appellants' agreement ... was a maritime contract," we applied the two-prong test of *Executive Jet* to determine the existence of a maritime tort. *Id.* at 865–66. We found that the alleged tortious interference exerted its effect on Louisiana soil because the plaintiff's attorneys performed their contracts there. Without a direct effect on navigable waters, there was no maritime tort. *Id.* at 866.

■ *Wiedemann* controls our resolution of this issue. It teaches that interference with a maritime contract does not vest

the court with admiralty tort jurisdiction absent an impact on navigable waters. It follows that inducement to enter a contract with maritime consequences does not bestow admiralty jurisdiction unless the situs requirement is met. Because the situs requirement is lacking, the forwarders failed to establish a maritime tort. The district court had no admiralty jurisdiction predicated on this theory.

### 2. Breach of Contract

For the reasons enunicated by the district court, which the forwarders do not challenge on appeal, we agree that the forwarders cannot base admiralty jurisdiction on a breach of maritime contract theory. *Kuehne & Nagel,* 625 F.Supp. 794 (S.D.Tex.1986).

▆ To support admiralty jurisdiction in a breach of contract action, the underlying contract must ordinarily be a maritime contract. *Rea v. The Eclipse,* 135 U.S. 599, 608, 10 S.Ct. 873, 876, 34 L.Ed. 269 (1890); 7A J. Moore, *Moore's Federal Practice* ¶ .270. Two exceptions to this general rule have developed. First, if the character of a contract is primarily maritime and the non-maritime aspects are merely incidental, admiralty jurisdiction may still be invoked. 7A J. Moore, *supra* at ¶ .270. Second, if a contract is "mixed" —having maritime and non-maritime aspects—maritime jurisdiction exists if the court can enforce the maritime obligations separately without prejudice to the rest. *See Jack Neilson, Inc. v. Tug Peggy,* 428 F.2d 54, 60 (5th Cir.1970), *citing Flota Maritima Browning De Cuba, Sociadad Anonima v. Snobl,* 363 F.2d 733, 735–36 (4th Cir.1966); *Hale v. Co–Mar Offshore Corp.,* 588 F.Supp. 1212, 1217 (E.D.La. 1984).

▆ A contract to transport goods over both sea and land obviously is not a traditional maritime contract. *See* G. Gilmore & C. Black, The Law of Admiralty § 1–10 (1975). We also agree with the district court that neither exception applies here. Ucamar contracted to truck the cargo up to 1,000 miles. Such extensive land-based operations cannot be viewed as merely incidental to the maritime operations. *See Alaska Barge and Transport, Inc. v. United States,* 373 F.2d 967, 971, 179 Ct.Cl. 216 (1967). Further, the forwarders allege that Ucamar and Geosource breached both the sea and the land-based portions of the contracts. We cannot separate these maritime and non-maritime obligations because each bill of lading contains a fixed, single freight charge for the sea carriage and the overland transportation. *Kuehne & Nagel,* 625 F.Supp. at 798. *See Alaska Barge,* 373 F.2d 967, 972 (separation of maritime and non-maritime elements in bills of lading that did not itemize the service's maritime portions would be "unduly burdensome").

Further, even if the maritime and non-maritime (overland) portions of the contract were separable, the forwarders have not limited their claim to damages accruing from breach of the maritime obligations. Instead, more than half of the damages sought by the forwarders are attributable to Ucamar's failure to provide trucking service between Turkey and Iran. In other words, the forwarders seek adjudication of the obligations in the whole contract, not just the maritime portions.

We agree with the district court's determination that no admiralty jurisdiction existed based on breach of a maritime contract.

### 3. Diversity

Having found that no admiralty jurisdiction existed under either a maritime tort or a maritime contract theory, we next consider whether diversity jurisdiction provided the district court with power to hear the case. For purposes of diversity jurisdiction, a corporation is considered a citizen of the state of its incorporation as well as the state where it has its principal place of business, 28 U.S.C. § 1332(a).

▆ Kuehne & Nagel is incorporated in West Germany. Geosource is incorporated in Texas. Ucamar is incorporated in the Cayman Islands. Geosource and Ucamar were named as party defendants by Kuehne & Nagel. Ucamar was never served with process and did not make an appearance.

But we agree with the district court that Geosource nevertheless assumed the additional citizenship of Ucamar for diversity purposes on Kuehne & Nagel's claim that Ucamar, as Geosource's alter ego, breached the contract of affreightment. *See Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 558–59 (5th Cir.1985) (parent corporation assumes the citizenship of its alleged alter ego non-diverse subsidiary corporation). Thus we must conclude that no diversity jurisdiction existed to entertain the action of the alien plaintiff, Kuehne & Nagel, against Geosource, because Geosource is also an alien once it assumes the residence of Ucamar.[3]

This conclusion is not undermined by the fact that Kuehne & Nagel's other claim against Geosource for fraudulent inducement is predicated on Geosource's own conduct and Geosource does not assume Ucamar's alien residence for this claim. Complete diversity must exist between each plaintiff and defendant on *all* claims. *Freeman,* 754 F.2d at 555. Thus, the district court lacked jurisdiction over Kuehne & Nagel's action against Geosource.

The dismissal of a plaintiff's complaint for lack of jurisdiction requires dismissal of a defendant's counterclaim unless the counterclaim presents independent grounds of jurisdiction. *See Envirotech Corp. v. Bethlehem Steel Corp.,* 729 F.2d 70, 73 (2d Cir.1984); *Nilsen v. City of Moss Point,* 621 F.2d 117, 122 (5th Cir.1980); *DHL Corp. v. Loomis Courier Service, Inc.,* 522 F.2d 982, 985 (9th Cir.1975); *City of Houston v. Standard–Triumph Motor Co.,* 347 F.2d 194, 201 n. 19 (5th Cir.1965); 6 C. Wright & A. Miller, Federal Practice & Procedure § 1414 (1971). However, if a compulsory counterclaim rests on an independent ground of federal jurisdiction, it may be adjudicated despite the dismissal of the plaintiff's complaint. *See Haberman v. Equitable Life Assurance Society of United States,* 224 F.2d 401, 409 (5th Cir. 1955); 6 Wright & Miller, *supra; see also Manufacturers Casualty Insurance Co. v.*

*Arapahoe Drilling Co.,* 267 F.2d 5, 7–8 (10th Cir.1959).

The face of Geosource's counterclaim against Kuehne & Nagel demonstrates an independent ground of federal jurisdiction. Geosource's counterclaim is its own; it is not asserting the counterclaim as Ucamar's alter ego. Accordingly, we hold there was jurisdiction over the counterclaim. On remand, the district court should give Kuehne & Nagel the opportunity to assert its dismissed claim as a compulsory counterclaim to Geosource's retained claim. *See Great Lakes Rubber Corp. v. Herbert Cooper, Inc.,* 286 F.2d 631 (3d Cir.1961); *St. Paul Fire & Marine v. Casualty Reciprocal Exchange,* 118 F.R.D. 480, 483 (N.D.Ark.1987); *Wong v. Bacon,* 445 F.Supp. 1177, 1188 (N.D.Cal.1977); *Crest Auto Supplies, Inc. v. Ero Mfg. Co.,* 246 F.Supp. 224, 228–29 (N.D.Ill.1965), *aff'd on other grounds,* 360 F.2d 896 (7th Cir.1966).

### B. H–85–2082

In this action Geosource sued SGS and Panalpina for tortiously interfering with the Geosource–Ucamar management services contract. Geosource invoked the diversity jurisdiction of the court against the two alien corporations. SGS and Panalpina counterclaimed, and asserted essentially the same breach of contract (via alter ego) and fraudulent inducement claims that Kuehne & Nagel asserted against Geosource in H–83–5913.

#### 1. Diversity Jurisdiction

The district court had diversity jurisdiction over Geosource's action against these two forwarders because a citizen of Texas is suing two aliens. 28 U.S.C. § 1332 (1982). Geosource sued the forwarders to recover its own losses resulting from the forwarders' alleged tortious interference with the Geosource–Ucamar contract; consequently we do not impute Ucamar's alien citizenship to Geosource for this claim. SGS and Panalpina's counterclaims are compulsory because they arise from the same transaction. *See Montgom-*

---

**3.** This disposition renders it unnecessary for us to consider whether Ucamar was an indispensible party.

ery Elevator Co. v. Building Engineering Services Co., 730 F.2d 377, 380 (5th Cir. 1984); Fed.R.Civ.P. 13(a). Compulsory counterclaims fall within the court's ancillary jurisdiction and do not require an independent jurisdictional basis. See Zurn Industries, Inc. v. Acton Const. Co., 847 F.2d 234, 236–37 (5th Cir.1988); Plant v. Blazer Financial Services, Inc. of Georgia, 598 F.2d 1357, 1359–60 (5th Cir.1979). Therefore, the counterclaims need not satisfy diversity requirements. H.L. Peterson Co. v. Applewhite, 383 F.2d 430, 433 (5th Cir.1967). Hence, all claims in this action were properly before the court.

### 2. Admiralty Jurisdiction

■■■ For the reasons discussed in Section II A, supra, SGS and Panalpina's counterclaims did not invoke the court's admiralty jurisdiction. Although the district court possessed ancillary jurisdiction over the counterclaims, no admiralty jurisdiction existed. Therefore, the court erred in denying Geosource's repeated requests for a jury trial on these counterclaims. Fed.R.Civ.P. 38.

Although we are sensitive to the expense and delays already endured by the parties, Geosource was entitled to a jury trial on the forwarders' claims. Geosource's action against the forwarders was tried to a jury. Unfortunately, the district court did not submit the forwarder's counterclaim to that same jury. We must remand the action for retrial before a jury.

### III. Merits

Having concluded that the claims in No. H–85–2082 between SGS, Panalpina and Geo-

source were properly in federal court—and that Kuehne & Nagel should have the opportunity to reassert its claims in federal court as counterclaims to Geosource's tortious interference action in No. H–83–5913— we turn to the merits.[4]

As noted earlier, the jury found that Kuehne & Nagel and Panalpina tortiously interfered with the Geosource–Ucamar management contract and awarded damages to Geosource; the jury exonerated SGS on this claim. One year later, the district court made its findings of fact and conclusions of law on the forwarders' breach of contract and fraudulent inducement claims against Geosource. In resolving the breach of contract claim, the court concluded that Ucamar existed only as Geosource's alter ego and that Ucamar had breached the contracts of affreightment. But the court found that commercial impracticability excused Ucamar's breach. The district court then entered judgment on the jury's earlier verdict as modified, and on the court's own findings and conclusions.

■■■ Initially, the forwarders urge us to find plain error in the district court's submission of Geosource's tortious interference claim to the jury. The forwarders argue that the court should have decided as a matter of law that the contract between Geosource and Ucamar was void for lack of distinct contracting parties.[5] Only an error so fundamental that it generates a miscarriage of justice rises to the level of "plain error." See Farrar v. Cain, 756 F.2d 1148, 1150 (5th Cir.1985).

---

4. For purposes of analysis in the balance of this opinion, we assume that on remand Kuehne & Nagel will seek permission to assert its claims against Geosource as a compulsory counterclaim to Geosource's counterclaim in No. H–83–5913. We also assume that no unforeseen impediment (such as prescription) will prevent the district court from allowing Kuehne & Nagel to pursue its claim in this fashion.

5. The forwarders must rely on the plain error standard here because they voiced no objection at trial to the submission of Geosource's tortious interference claim to the jury. Although the parties argued alter ego at length to the district court in connection with the forwarders' breach

of contract claim against Geosource, the forwarders did not plead alter ego as a defense to Geosource's tortious interference claims. Nor did the forwarders raise alter ego through requested jury instructions and special interrogatories, or in their motion for directed verdict. Although they raised the point obliquely in their motion for judgment notwithstanding the verdict, a party cannot base a motion for judgment n.o.v. on grounds not included in a prior motion for directed verdict. Ramada Dev. Co. v. Rauch, 644 F.2d 1097 (5th Cir.1981); 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 50.08.

The forwarders contend that the trial court, which bears responsibility for applying the law to undisputed facts, should have recognized Ucamar's alter ego status based on "uncontested facts." *See Industrial Dev. Bd. v. Fuqua Indus., Inc.,* 523 F.2d 1226, 1240 (5th Cir.1975). Thus, they reason that Ucamar's alter ego status precludes a tortious interference finding because a party cannot contract with itself. *See Restatement (Second) of Contracts* §§ 9, 17–18 (1963).

But the alter ego facts were not undisputed. The parties presented conflicting evidence on at least two key issues: (1) the sufficiency of Ucamar's capitalization; and (2) the extent to which Geosource "controlled" Ucamar's operations given that a principal in Ristram (Germany)—Ucamar's other fifty percent shareholder—allegedly disrupted Ucamar's operations in Turkey. *See generally United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691–92 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986) (listing factors relevant to alter ego determination); *Castleberry v. Branscum,* 721 S.W. 2d 270, 272 (Tex.1986). In this context we cannot characterize the district court's submission to the jury of forwarders' claims against Geosource as a "fundamental error resulting in a miscarriage of justice." *Morreale v. Downing,* 630 F.2d 286, 290 (5th Cir.1980); *see also Jamison Co., Inc. v. Westvaco Corp.,* 526 F.2d 922, 933 (5th Cir.1976).

While we reject the forwarders' plain error complaint, we conclude that the proper resolution of this convoluted case nonetheless requires us to exercise our discretion and order a retrial of Geosource's tortious interference claims against all three forwarders. As noted earlier, the district court erroneously denied Geosource a jury trial on the compulsory counterclaims of SGS and Panalpina, and on Kuehne & Nagel's claim; those claims must be retried to a jury. We are persuaded that the degree to which Geosource's tortious interference claims against Kuehne & Nagel and Panalpina intertwine with the forwarders' breach of contract claims demands that these claims be retried as well. We also conclude that the need for a new jury to view all the actions of all the parties comprehensively requires retrial of Geosource's tortious interference claim against SGS as well.

In granting a new trial, an appellate court enjoys wide discretion in determining whether a particular case requires only a partial retrial, a retrial of all issues, or a retrial regarding all parties. *See Gasoline Prod. Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Washington Gas Light Co. v. Lansden,* 172 U.S. 534, 556, 19 S.Ct. 296, 304, 43 L.Ed. 543 (1899); 6A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 59.06. The necessity of a retrial on all issues depends on whether "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prod. Co.,* 283 U.S. at 500, 51 S.Ct. at 515.

The respective claims of Geosource and the forwarders do not meet that separability standard. Because of the alter ego issue, the forwarders' breach of contract claims and Geosource's tortious interference claim against Kuehne & Nagel and Panalpina "are not independent, but are interdependent." *Jamison,* 526 F.2d at 935. In concluding that Ucamar breached its contracts of carriage, the district court explicitly found that Ucamar existed only as Geosource's alter ego. But the jury found that Kuehne & Nagel and Panalpina tortiously interfered with a contract that could not exist unless Ucamar and Geosource existed as separate entities.[6]

---

**6.** The record demonstrates confusion about whether the court intended for the jury to decide the alter ego issue in resolving Geosource's tortious interference claim.

Special Interrogatory No. 3 reads in part:

In this interrogatory, you are asked whether Kuehne & Nagel, SGS or Panalpina, tortiously interfered with Geosource, Inc.'s Technical Services and Management Agreement with Ucamar.

The overlap between the forwarders' breach of contract evidence and Geosource's tortious interference evidence creates another potential conflict. Geosource based its tortious interference claim, in part, on evidence that Kuehne & Nagel, Panalpina and SGS negotiated with Ristrans (Turkey) before Ucamar revoked its time charter on a ship carrying Panalpina's cargo. The forwarders portray the same actions as necessary efforts to mitigate damages in the face of Ucamar's breach. *See Hector Martinez and Co. v. Southern Pacific Transp. Co.*, 606 F.2d 106, 109 n. 4 (5th Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980).

Our decision to remand for a new jury trial on Geosource's tortious interference claim against Kuehne & Nagel and Panalpina finds support in *Williams v. Slade*, 431 F.2d 605, 608–09 (5th Cir.1970). The plaintiff—a passenger injured in a two-car collision at an intersection—appealed the district court's directed verdict in her negligence suit against her host driver. The panel concluded that the district court erroneously granted the directed verdict and remanded for a new trial. The court also stated:

> [A] court may properly award a partial new trial only when the issue affected by the error could have in no way influenced the verdict on those issues which will not be included in the new trial. If the decision on the other issues could in any way have been infected by the error then a new trial must be had on all issues.

*Id.* at 608. Thus the panel ordered a new trial on the passenger's negligence claim against the driver of the other car, who had been exonerated in a jury trial.

The *Williams* court noted that *someone's* negligence must have caused the collision because no evidence suggested an unavoidable accident. *Id.* at 609. Thus, the court stressed that presenting a new jury with an all-or-nothing choice regarding just one driver would place the jury's determination in doubt, just as it had the first time. *Id.* The court concluded that "The jury should have been given the opportunity to view the accident comprehensively, taking into its vista the acts and omissions of both [defendants]". *Id.*

Here too, the jury should have been permitted to view the parties' respective breach of contract and tortious interference claims comprehensively. Were we to leave the jury's tortious interference findings against Kuehne & Nagel and Panalpina intact, yet permit a new jury to evaluate the related breach of contract and alter ego issues, we would open the door to the same conflict that occurred below—holdings that in practical terms mean Ucamar was Geosource's alter ego for some claims but not others. Similarly, were we to follow the forwarders' suggestion and "supplement" this jury's verdict with the district court's alter ego finding, we would set up a conflict if a new jury finds that no alter ego status existed between Geosource and Ucamar in connection with the forwarders' breach of contract claim.

Nor can we say that the breach of contract issue—improperly decided by the district court below—"could have in no way influenced" the jury's tortious interference verdicts. *See Williams*, 431 F.2d at 608. We cannot be certain that the jury would have reached the same conclusions regarding tortious interference had it been required to confront all of the evidence relat-

---

The term "tortious interference" is willful and intentional interference with existing contractual relations that causes harm or damage. The jury found that Kuehne & Nagel and Panalpina tortiously interfered with the contract. The forwarders argue that this interrogatory did not require the jury to determine whether a binding contract existed between Geosource and Ucamar because the question assumed the contract's existence. They also point to Geosource's closing argument, in which Geosource told the jury it was not required to decide the contract's validity. Geosource counters that the interrog-

atory's definition of tortious interference required the jury to confront the issue of the contract's existence. Neither party requested a jury charge highlighting the issue of the contract's validity. The district court compounded this confusion a year later when it entered extensive findings on the forwarders' claims against Geosource and concluded that Ucamar was Geosource's alter ego. Given our conclusion that the intertwined claims must be retried to the same jury, we do not decide whether the jury's verdict implicitly decided the alter ego issue.

ing to the forwarders' breach of contract claims as well.

While we recognize that the jury exonerated SGS on Geosource's tortious interference claim, we conclude *Williams* also supports retrial of that claim. The overlapping nature of the evidence in SGS' breach of contract claim against Geosource and Geosource's tortious interference claim against SGS makes us wary of retrying only Geosource's breach of contract and fraudulent inducement claims. Further, we note that the issues involved in No. H-83-5913 and No. H-85-2082 intertwine as well. The evidence relating to alter ego, breach, and impracticability of performance relates to all three forwarders. For these reasons, we conclude that the new jury should be "given the opportunity to view the [dispute] comprehensively...." *Williams*, 431 F.2d at 609.

Given this resolution, we do not reach the parties' remaining points on appeal.

### IV.   Conclusion

In No. H-83-5913, the lack of diversity between Kuehne & Nagel and Ucamar precludes federal jurisdiction over Kuehne & Nagel's claims. However, Geosource's counterclaim asserted in that suit satisfies diversity jurisdiction. Because we have federal jurisdiction to entertain Geosource's counterclaim, Kuehne & Nagel will have the opportunity on remand to assert its claims against Geosource by way of counterclaim.

In No. H-85-2082, the claims of SGS and Panalpina, asserted by way of counterclaim and properly in federal court under the court's ancillary jurisdiction, must be retried to a jury. Further, because of the degree to which Geosource's tortious interference claims against all three forwarders intertwine with the forwarders' breach of contract claims against Geosource, we order retrial of Geosource's claim against the forwarders as well.

Accordingly, the judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

VACATED and REMANDED.