**Kareem YEHIA, Plaintiff–Appellant,**

**v.**

**ROUGE STEEL CORPORATION, Defendant–Appellee.**

**No. 88–1826.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1989.

Decided March 23, 1990.

Rehearing Denied May 7, 1990.

Dennis M. O'Bryan (argued), Birmingham, Mich., for plaintiff-appellant.

Paul D. Galea (argued), John L. Foster, Foster, Meadows & Ballard, Detroit, Mich., for defendant-appellee.

Before NELSON and RYAN, Circuit Judges, and MEREDITH, District Judge.[*]

* The Honorable Ronald E. Meredith, U.S. District Judge for the Western District of Kentucky, sitting by designation.

DAVID A. NELSON, Circuit Judge.

This is an appeal from a judgment entered on a jury verdict for the defendant in an action brought under the Jones Act, 46 U.S.C. § 688 *et seq.*, and under general maritime law by a deckhand who claimed to have been injured on two occasions while working in the cargo hold of a merchant vessel on the Great Lakes.

There was no evidence of contributory negligence on the part of the plaintiff, and the district court ruled out contributory negligence as a defense. Over the plaintiff's objection, however, the court instructed the jury that its verdict must be for the defendant if it determined that the plaintiff's injuries were caused by a condition of unseaworthiness resulting solely from a failure by the plaintiff to perform the responsibilities assigned him.

The record, as we read it, contains no evidence from which the jury could have found that the plaintiff failed to perform his assigned responsibilities. Accordingly, we shall reverse the judgment and remand the case for a new trial.

### I

The plaintiff in this action, Kareem Yehia, is a Yemeni citizen who came to the United States in 1966, at the age of 24, and eventually secured work on lake boats operated by the Ford Motor Company or its subsidiaries. Mr. Yehia's command of English appears somewhat shaky, but he was able to testify without an interpreter.

In the spring of 1986, Mr. Yehia said, he was employed on the crew of the *M/V Henry Ford II*, a self-unloading bulk cargo carrier owned and operated by Ford's Rouge Steel subsidiary. The vessel was used to carry several different commodities, including rock salt, coal, and crushed slag or stone. After one commodity was unloaded, and before a different one was taken aboard, it was necessary for crew members to clean out the cargo hold in order to avoid contamination of the new load. Mr. Yehia assisted in doing this.

Because the cargo hold had sloping floors on which grease and oil were deposited by machinery used in unloading, men working in the hold frequently lost their footing. This happened to Mr. Yehia "many times," he testified, as it did to everybody else who worked there. A fellow seaman confirmed that because of the slope of the floors and the oil and grease, "you slipped quite often...." The plaintiff presented evidence to show that there had been numerous complaints about safety conditions in the hold, but no corrective measures had been taken.

Before describing Mr. Yehia's account of the incidents in which he claimed to have been injured, we need to say something more about the design of the hold and the procedures followed in the unloading operations.

The record shows that along the bottom of the hold, running fore and aft in the center of the vessel, was a row of 67 hoppers, or "gates." Bulk cargo could be released through these gates to descend, by gravity feed, to conveyor belts in a "tunnel" below the hold.

On both sides of the gate openings, sloping down from the openings at an angle of roughly 30 degrees, was steel decking that extended to the sides of the vessel. A cross section might look something like this:

The gate openings were eight feet across, and each of the sloping decks was substantially wider than that.

Because of the configuration of the bottom of the hold—a configuration described by counsel as "an inverted W"—not all of the cargo would funnel through the hop-

pers when the gates were opened for unloading. In order to remove the portion of the cargo left at the sides of the gate openings, a large piece of motorized equipment called a "reclaimer" would be driven down the length of the hold. The reclaimer had rotating augers set at an angle that matched the angle of the decking. As the machine made its way along the hold, the augers (which raked the entire width of the decks) would carry most of the remaining cargo up to the gate openings. When it reached the higher end of the auger, the material would fall through the openings onto the conveyor belts below.

The *Henry Ford II* had been converted into a self-unloader in 1974, the evidence showed, and the reclaimer had been installed at that time. The machine was lubricated with grease and substantial quantities of waste oil. The evidence was in conflict as to whether the device had leaked oil and grease from the very beginning, but there was no dispute about the fact that from 1976 onward, at least, there was a "drippage" of oil from the reclaimer onto the steel decks of the hold. The vessel's chief engineer testified that he and his predecessor and others had tried to stop the drippage, but were unable to do so.

Once the reclaimer had made its sweep through the hold, deckhands like Mr. Yehia would be sent down into the hold to shovel up whatever cargo had been missed by the reclaimer. Standing on the sloping deck, and holding a shovel with both hands, the deckhand would shovel the residue up into the gate openings. After that task was completed, the deckhand would hose the decks down with a high pressure fire hose. The seaman would walk up and down the sloping decks playing the water on them as he went.

The hosing of the decks, Mr. Yehia testified, would spread a film of grease and oil over their entire surface. Mr. Yehia also testified, without contradiction, that he and his fellow crewmen never used rags to clean up the oil and grease. The defendant made no attempt to show that Mr. Yehia ought to have wiped the decks clean with rags, or that he was responsible for doing

anything more, in the way of cleanup, than shoveling out the cargo missed by the reclaimer and then going over the decks with the high pressure hose.

With that background, we turn to Mr. Yehia's account of his first accident. It occurred, he said, on May 9, 1986, when he was washing down the decks in the cargo hold. An accident report prepared two days later says that the vessel was at sea at the time. Mr. Yehia testified that he lost his footing "because [of] too much grease and oil." He tried to break his fall with one hand, and the pressurized hose hit him in the mouth. The accident report indicates that it was the nozzle of the hose that hit him, loosening a front tooth. Mr. Yehia was treated at the University of Chicago hospital, where a tooth was extracted. He received further dental care in Detroit.

The second accident—allegedly more serious—was said to have occurred on June 14, 1986, at about 9:45 in the morning. The vessel was docked in South Chicago, where a cargo of rock salt was being unloaded. Mr. Yehia and a fellow deckhand were in the cargo hold shoveling rock salt into the gates after the reclaimer had gone through. Mr. Yehia slipped on grease and oil that were underneath the salt, according to his testimony, and he injured his back in trying to avoid a fall.

The other deckhand advised him to take a hot shower. Mr. Yehia did so, without reporting the accident at that time. He continued working until 4:00 o'clock the next morning, and reported the accident later in the morning, about 24 hours after it was said to have occurred. Mr. Yehia continued working for several more days, but now claims to be disabled because of the back injury he suffered on June 14.

## II

Mr. Yehia sued the vessel owner for negligence and unseaworthiness. The complaint alleged, among other things, that "Defendant owed Plaintiff a duty to exercise care in his behalf, and provide him a safe place to work." A breach of this duty was claimed to have occurred by reason of the defendant's failure to prevent the re-

claimer from "emanating" grease and oil onto the sloping cargo hold decks. Asserting that the injuries he sustained in May and June of 1986 were the result of the defendant's breach of its duty of care and of its duty to provide a seaworthy vessel, the plaintiff prayed for an award of compensatory and punitive damages in a substantial amount.

The defendant's answer asserted that the plaintiff's damages were caused in whole or in part by the plaintiff's own "negligence, lack of care or fault." The answer went on to allege that "the plaintiff was guilty of comparative negligence which was the sole proximate cause and/or contributing cause for any injury or damage sustained in that he was heedless of his own safety and failed to exercise that degree of care that an ordinary prudent seaman would exercise under the same or similar circumstances."

The case was tried to a jury of seven. After both sides had rested, the plaintiff moved for a directed verdict on the issue of comparative negligence. Concluding that there had been no evidence of any negligence on the plaintiff's part, the court declined to give a jury instruction on this issue. "I am ruling out contributory negligence as a defense," the court told counsel.

The court's charge to the jury was, for the most part, unexceptionable. For reasons not explained on the record, however, and over the plaintiff's objection, the court granted a request by the defendant for an instruction based on *Peymann v. Perini Corp.*, 507 F.2d 1318 (1st Cir.1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975). The requested charge, given in the course of the court's instructions on seaworthiness, told the jury that there could be no recovery if the plaintiff's injuries were caused solely by a failure on the part of the plaintiff to carry out his assigned duties:

"If you find that the condition of unseaworthiness, which was the cause of the plaintiff's accident, was due solely to the failure of the plaintiff to carry out his duty to his employer, then you must find for the defendant in this case.

In short, Plaintiff cannot recover on the basis of an unseaworthy condition which is due wholly and solely to a failure on his part to perform the responsibilities that were assigned. That is one of the aspects of the case that it is the burden of the defendant to establish."

The propriety of this instruction is one of the two issues raised by the plaintiff on appeal. The other concerns the propriety of the district court's refusal to give a "safe place to work" instruction requested by the plaintiff. This instruction would have given the jury the following guidance:

"It was the continuing duty of the defendant, as an employer, at the time and place in question, to use ordinary care under the circumstances, in furnishing the plaintiff with a reasonably safe place in which to work, and to use ordinary care under the circumstances to maintain and keep such place of work in a reasonably safe condition. This does not mean, of course, that the employer is a guarantor or insurer of the safety of the place to work. The extent of the employer's duty is to exercise ordinary care, under the circumstances, to see that the place in which the work is to be performed is reasonably safe, under the circumstances shown by the evidence in the case."

Although this instruction was not given, the jury was told that under maritime law every shipowner is under a nondelegable duty to keep and maintain the ship in a seaworthy condition at all times. The seaworthiness instruction continued as follows:

"To be in a seaworthy condition means to be in a condition reasonably suitable, fit and safe to be used for purpose or use for which provided and intended. An unseaworthy condition may result from an unreasonably slippery work area caused by oil or grease contamination. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. That is to say, the shipowner or operator is liable for all injuries and consequent damage proximately caused by an unseaworthy condi-

tion existing at any time, even though the owner or operator may have exercised due care under the circumstances, and may have had no notice or knowledge of the unseaworthy condition which proximately caused the injury or damage."

The defendant argues that if the court erred in refusing to give the requested "safe place to work" instruction, the error was harmless in light of the instruction that was given on seaworthiness.

After deliberation, the jury returned a special verdict in which it found that the defendant was not negligent as to either accident and that the defendant's vessel was not unseaworthy as to either accident. Judgment was accordingly entered in favor of the defendant. Motions for amendment of the judgment and for a new trial were overruled, and this appeal followed.

### III

■ We turn first to the contention that the district court erred in telling the jury that it would have to return a verdict in favor of the defendant if it found that the vessel was unseaworthy because of a "failure of the plaintiff to carry out his duty to his employer."

Logically, perhaps, it might have been open to the defendant company to argue that any error in the giving of this instruction was harmless, the jury having found that the vessel was not, in fact, unseaworthy. The defendant has not advanced such an argument. On the contrary, counsel for the defendant frankly acknowledged that the defense verdict in this case could have been the result of the jury's concluding that the plaintiff seaman failed to carry out his duty and failed to perform the responsibilities assigned him.

This concession probably reflects an accurate understanding of how juries often function. Having listened to a lengthy charge covering a variety of possibly unfamiliar legal principles, a jury that does not parse each sentence with care may well carry into the jury room some general impressions that are less precise than they would be if the court's words were subject-

ed to the sort of close and rigorous analysis that a logician might employ. In any event, we are not prepared to say in this case that the jury's finding of no unseaworthiness rules out the possibility that there might have been a verdict in favor of the plaintiff but for a sense that the plaintiff could be found guilty of some breach of duty to the employer.

We would have no problem with the instruction in question if there had in fact been evidence of a breach of duty by plaintiff Yehia. As we read the trial record, however, there was none. The arguments advanced by the defendant in this connection are not persuasive.

What the defendant says, basically, is that it was the plaintiff's job to clean up the cargo hold. Cleaning the hold entailed the removal of any remnants of cargo and the removal of any grease or oil that had dripped out of the reclaimer. If the plaintiff had done his job, there would have been no grease or oil to slip on.

But the plaintiff had no magic wand with which he could make oil and grease disappear instantaneously. What he had was a shovel and a high pressure hose. The shovel obviously could not make an oily sloping deck safe to walk on, and the shoveling had to be completed before the hose could be used. The function of the hose, moreover, was not to make the decks safe to walk on, but to remove all remaining traces of rock salt so it would not contaminate the next cargo. The plaintiff testified that the hose spread the oil over the whole deck; the defendant made no attempt to challenge that testimony.

Unlike the plaintiff in *Noack v. American Steamship Co.*, 491 F.2d 937 (6th Cir. 1974), who was employed as a "wiper" and whose job "include[d] wiping up grease and oil from the decks of the vessel," *id.* at 938, Mr. Yehia was working as a deckhand in 1986. He had worked as an engineroom wiper on other boats in the past, and what he had used to clean up with then had not been shovels and hoses, but rags. Unlike the enginerooms of the boats on which Mr. Yehia had worked before, the cargo hold of

the *Henry Ford II* was "never" cleaned with rags. There was no evidence to suggest that Mr. Yehia—or any other employee, for that matter—was responsible for wiping the decks of the cargo hold clean of oil and grease *at any stage,* much less before shoveling and hosing operations took place.

The facts of this case bear some resemblance to those in *McCoy v. United States,* 689 F.2d 1196 (4th Cir.1982), where a seaman sustained two separate falls on oily surfaces of a vessel owned by the United States. Affirming a finding of liability for one accident, and reversing a judgment of no liability for the other, the Court of Appeals for the Fourth Circuit noted that "[w]e have consistently held that a seaman cannot be faulted for recognizing his job is dangerous and doing it anyway, unless he deliberately spurns a safe alternative provided him." *Id.* at 1198.

Declining to hold that "a shipowner can avoid liability by ordering a seaman to repair an unseaworthy condition," *id.* at 1198–99, n. 1, the *McCoy* court declared that:

> "It is irrelevant that the unseaworthy condition was obvious to McCoy unless it was shown that he spurned safe alternatives. McCoy's duty was to maintain the fans, and he cannot be held to have breached this duty simply by recognizing the job was dangerous."

> \*     \*     \*     \*     \*     \*

Whether faced with repairing an unseaworthy condition (as in October), or being forced to surmount an unseaworthy condition to carry out his regular duties (as in August), he cannot be held to fault for attempting to carry out his orders. Nor is the ship made immune because part of McCoy's duties include cleaning oil spills." *Id.* at 1198.

The rule is not different in this circuit:

> "A seaman may not be denied recovery because he proceeds in an unsafe area of the ship or uses an unsafe appliance in absence of a showing that there was a safe alternative available to him." *Tolar v. Kinsman Marine Transit Co.,* 618 F.2d 1193, 1195 (6th Cir.1980).

In the case at bar there was not a shred of evidence that Mr. Yehia had a safe alternative available to him. The district court implicitly recognized as much in ruling out contributory negligence as a defense. The court was correct in doing so: "the defense of contributory negligence requires evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition." *Hall v. American Steamship Co.,* 688 F.2d 1062, 1066 (6th Cir.1982) (citations omitted). Where, as in *Hall,* the shipowner "does not claim that [the plaintiff] acted in any manner, aside from exposing himself to the conditions, that was negligent," the defense of contributory negligence will not lie. *Id.* See also *Burden v. Evansville Materials, Inc.,* 840 F.2d 343, 346 (6th Cir. 1988), where we endorsed the observation of the trial judge (Meredith, J.) that "[i]t is *imperative* that there [be] some negligent act or omission by the seaman other than his knowledgeable acceptance of a dangerous condition." 636 F.Supp. 1022 at 1036 (emphasis supplied).

There is nothing to the contrary in *Peymann v. Perini Corp.,* 507 F.2d 1318 (1st Cir.1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975), the case from which the jury instruction here at issue was borrowed. The plaintiff in *Peymann* was a ship's engineer who elected to stand on an oil-covered pipe rail in order to reach an overhead chain and pulley device in his engineroom. The engineer admitted that as the officer in charge of the engineroom, it was his duty to obtain a step ladder if one was available and needed, just as it was his duty to keep the pipe rail clean and free of oil. He had no real answer to the suggestion that he should not have stood on the rail "without [at least] wiping it." *Id.* at 1321. In holding that the challenged instruction was appropriate under these circumstances, the Court of Appeals for the First Circuit observed that "if there was a ladder available which was the single means the engineer was supposed to use, as, indeed, his own testimony suggested, it would not be proper to hold the vessel responsible to any

degree if his decision not to use it was a free choice." *Id.* at 1322. "Similar reasoning applies," the court went on to say, "if plaintiff, having the primary duty to clean up oil, unnecessarily proceeded without doing so."

The distinctions between that case and this are obvious. There was no showing here that plaintiff Yehia had "the primary duty"—or any duty—to clean up oil from the deck of the cargo hold. Unlike the plaintiff in *Peymann,* moreover, who did no cleaning at all, plaintiff Yehia was injured in the very act of performing the cleaning operations he had been assigned to perform. There was no showing here that plaintiff Yehia proceeded "unnecessarily" to perform his assigned tasks without first wiping the decks clean. And there was no showing here that plaintiff Yehia abused any "free choice" between a safe method of proceeding and an unsafe method. Mr. Yehia's job was to shovel up the loose cargo and hose out the residue. That was precisely what he was doing, using the tools be was supposed to be using and standing where he was supposed to be standing.

The *Peymann* instruction clearly ought not to have been given under the circumstances of this case. See *Joia v. Jo–Ja Service Corp.,* 817 F.2d 908 (1st Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988), where a panel of the same court that decided *Peymann* held that the defendant was not entitled to a *Peymann* instruction where someone over whom the plaintiff had no control had let a mixture of hydraulic oil and water flood an engineroom, and the plaintiff, who had been directed to clean up the mess, slipped and fell as he walked through the oil and water on the engineroom deck. The rule of *Peymann* is no more applicable in the case at bar than it was in *Joia v. Jo–Ja Service Corp.*

## IV

The question of a "safe place to work" instruction need not detain us long. That an employer has a duty to use reasonable care to furnish his employees a safe place to work is a rule deeply ingrained in case law under the Federal Employer's Liability Act, 45 U.S.C. §§ 51 *et seq.* See *Bailey v. Central Vermont Ry.,* 319 U.S. 350, 352–53, 63 S.Ct. 1062, 1063–64, 87 L.Ed. 1444 (1943). The rules that govern the liability of railroads under the FELA serve also to govern the liability of shipowners under the Jones Act. *Tolar v. Kinsman Marine Transit Co., supra,* 618 F.2d at 1196. The requested instruction ought to have been given as part of the court's charge on negligence under the Jones Act, notwithstanding that a somewhat similar instruction—one significantly more favorable to the plaintiff, because it would have allowed recovery without any finding of negligence—was given as part of the seaworthiness charge. It is well established that where negligence and unseaworthiness are tried together, the judge must instruct on both. *Comeaux v. T.L. James & Co., Inc.,* 702 F.2d 1023, 1025 (5th Cir. 1983); *Mohn v. Marla Marie, Inc.,* 625 F.2d 900, 901 (9th Cir.1980).

It is doubtful whether the plaintiff was prejudiced by the failure to include the safe place to work instruction in the charge on negligence, given the cognate instruction on unseaworthiness. That issue need not be decided here, however; we have already found that the giving of the *Peymann* instruction constituted reversible error, so this case must be remanded in any event. The courts of appeals possess wide discretion to determine whether a retrial should be had on all issues, *Kuehne & Nagel (AG & CO) v. Geosource, Inc.,* 874 F.2d 283, 293 (5th Cir.1989), and in the exercise of our discretion we shall direct a full retrial.

In deciding on the scope of a retrial, the court must consider whether "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice," *Gasoline Products v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931), and whether "it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue." *Thompson v. Camp,* 167

F.2d 733, 734 (6th Cir.), *cert. denied,* 335 U.S. 824, 69 S.Ct. 48, 93 L.Ed. 378 (1948). It is true that negligence and seaworthiness are often separable. See *Brooks v. Great Lakes Dredge–Dock Co.,* 754 F.2d 539, 541 (5th Cir.1985) (granting new trial on negligence, damages, and unseaworthiness, but not on contributory negligence); *Herrmann v. Nocor Marine, Inc.,* 664 F.Supp. 241, 244–45 (E.D.La.1985) (granting new trial on unseaworthiness claim but not on Jones Act claim). In this case, however, we cannot say with confidence that the erroneous *Peymann* instruction did not affect the jury's determination of whether Rouge Steel was negligent, especially in light of the error in the negligence instructions.

"[A]ppellate courts should be slow to impute to juries a disregard of their duties," *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933), and we are not unmindful of the fact that the trial court instructed the jury to consider each claim separately. As the briefs and arguments in this case inadvertently demonstrated, however, the line between negligence and unseaworthiness is sometimes unclear even to lawyers, let alone laymen. On balance, we think the more prudent course would be to remand for a new trial on all issues.

If the action is not settled and has to be retried, the trial court should give the safe place to work instruction if the plaintiff again requests it. In that event, the court may wish to add an explanatory word on the difference between the alternative theories being presented. Absent such an explanation, an attentive jury might be puzzled at being told both that the employer need only use ordinary care to keep the workplace reasonably safe and that the employee can be held liable for an unreasonably slippery work area even though the employer may have exercised due care.

The judgment is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.

RYAN, Circuit Judge, dissenting.

Although the so-called *Peymann* instruction should not have been given under the circumstances of this case, I find the giving of the instruction was harmless error.

A *Peymann* instruction precludes a plaintiff's recovery on an unseaworthiness claim if the unseaworthiness condition of the vessel is due solely to the plaintiff's failure to perform his assigned duties. *Peymann v. Perini Corp.,* 507 F.2d 1318, 1323 (1st Cir.1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

In the course of the court's instructions on unseaworthiness, the court gave a *Peymann* instruction:

If you find that the condition of unseaworthiness, which was the cause of the plaintiff's accident, was due solely to the failure of the plaintiff to carry out his duty to his employer, then you must find for the defendant in this case.

The instruction requires the jury *first* find the vessel unseaworthy, and then that the unseaworthiness was a cause of the plaintiff's accident *before* determining whether the unseaworthiness was caused by the plaintiff.

The jury made no such preliminary findings in the instant case. To the contrary, the jury answered "No" to the question in the special verdict form: "Was the defendant's vessel unseaworthy?" Because the jury found defendant's vessel was not unseaworthy, it could not properly have reached the succeeding causation question in the special verdict form: "Was any unseaworthiness of the vessel a cause of plaintiff's alleged injury?" It follows that the jury must have found in favor of defendant without considering the *Peymann* instruction. Therefore, I conclude the giving of the *Peymann* instruction was harmless error and I would affirm the judgment in favor of the defendant.

As the majority opinion indicates, defense counsel failed to advance a harmless error argument on appeal and, in fact, during oral argument, conceded that because of the *Peymann* instruction, the jury verdict could have been the result of the jury's finding that plaintiff breached a duty owed to defendant, his employer. However, a concession by defense counsel on appeal

need not be adopted by this court on review, particularly where, as here, the concession has no support in evidence and is based on pure speculation. I agree with the majority that there was no evidence on the record indicating plaintiff failed to perform his assigned duties.

Even if I were to agree with the majority that the giving of the *Peymann* instruction on plaintiff's unseaworthiness claim constituted reversible error, I would not remand on the Jones Act negligence claim for retrial. The *Peymann* instruction does not apply to the Jones Act claim and this court declined to find the failure to give the safe place to work instruction on the Jones Act claim was reversible error. Even if the *Peymann* instruction were reversible error, which I do not concede, only plaintiff's unseaworthiness claim should be reversed.

I would affirm the judgment.